T.C. Memo. 2006-90

UNITED STATES TAX COURT

JERRY AND PATRICIA A. DIXON, ET AL.,[1] Petitioners
v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 9382-83, 10588-83,     Filed May 2, 2006.
            17642-83, 17646-83,

---

[1]Cases of the following petitioners have been treated as cases related to the above-captioned case for purposes of the additional evidentiary hearing required to give effect to the mandates of the Court of Appeals for the Ninth Circuit in Dixon v. Commissioner, 316 F.3d 1041, 1047 (9th Cir. 2003), as amended Mar. 18, 2003 (Dixon V), revg. and remanding T.C. Memo. 1999-101 (Dixon III):  Robert H. and Barbara A. Gridley, docket Nos. 10588-83, 10931-84, 38757-84; Norman W. and Barbara L. Adair, docket Nos. 17642-83, 38965-84, 35608-86, 479-89, 8070-90; Ronald L. and Mattie L. Alverson, docket No. 17646-83; Russell L. Fleer, Sr. and Sally A. Fleer, docket Nos. 27053-83 and 13477-87; Hoyt W. and Barbara D. Young, docket Nos. 4201-84, 22783-85, 30010-85; Robert L. and Carolyn S. DuFresne, docket Nos. 15907-84, 30979-85; John L. and Terry E. Huber, docket No. 20119-84; Arden L. and Barbara G. Blaylock, docket No. 28723-84; Terry D. and Gloria K. Owens, docket No. 40159-84; Richard and Fiorella Hongsermeier, docket No. 29643-86; Willis F. McComas, II and Marie D. McComas, docket No. 19464-92; Wesley Armand and Sherry Lynn Cacia Baughman, docket No. 621-94; Joe A. and JoAnne Rinaldi, docket No. 7205-94; Norman A. and Irene Cerasoli, docket No. 9532-94; Stanley C. and Sharon A. Titcomb, docket No. 17992-95; Richard B. and Donna G. Rogers, docket No. 17993-95.  The 27 related cases have been consolidated for briefing and opinion.

27053-83,    4201-84,
10931-84,   15907-84,
20119-84,   28723-84,
38757-84,   38965-84,
40159-84,   22783-85,
30010-85,   30979-85,
29643-86,   35608-86,
13477-87,     479-89,
 8070-90,   19464-92,
  621-94,    7205-94,
 9532-94,   17992-95,
17993-95.

In Dixon v. Commissioner, 316 F.3d 1041 (9th Cir. 2003), revg. and remanding T.C. Memo. 1999-101, the Court of Appeals held that the misconduct of R's trial attorney and his supervisor in the trial of the test cases for the Kersting tax shelter project, in agreeing with counsel for T, one of the test case Ps, to a secret settlement of T's deficiencies (not disclosed to IRS management, to this Court, or to counsel for other test case Ps), was a fraud on the Court.  The Court of Appeals ordered this Court to sanction R by entering judgment in favor of the remaining test case Ps and other Ps in the Kersting tax shelter group before the Court on "terms equivalent to those provided in the [final] settlement agreement with [T] and the IRS", leaving to this Court's discretion "the fashioning of such judgments, which to the extent possible and practicable, should put these taxpayers in the same position as provided in the [T] settlement".

R argues that the substance of the T settlement was a 20-percent reduction of T's 1979-1981 deficiencies, plus the payment of T's attorney's fees. Ps argue that the T settlement was, in form and substance, a 62.17-percent reduction of T's 1979-1981 deficiencies, plus other benefits that bring the T settlement to a 79.92-percent reduction in the deficiencies.  The parties agree that the T settlement also included cancellation of all additions and penalties, including nonshelter-related additions and penalties, and the use of a "burnout" to reduce the accrual of interest on the remaining deficiencies.  Ps

argue that interest on the deficiencies should not be charged beyond Dec. 31, 1986, which, in their view, marks the inception of the fraud on the court. R has conceded that no interest will be charged on the deficiencies for the period of the appeals to the Ninth Circuit commencing in 1992.

Held:  The final settlement of T's 1979-1981 deficiencies amounts to a 62.17-percent reduction of those deficiencies.

Held, further:  Two minor additional benefits included in the T settlement bring the reduction percentage up to 63.37 percent.

Held, further:  The T settlement encompasses and requires the vacating of the portion or portions of the deficiencies determined against any Ps that may be attributable to the "Bauspar" shelter that was also promoted by Kersting and to any other issues not arising from shelters promoted by Kersting.

Held, further:  Interest on the reduced deficiencies shall not be charged beyond the date in 1992 fixed by R's concession and shall not be stopped as of any earlier date.

Henry G. Binder and John A. Irvine, for petitioners in docket Nos. 9382-83, 15907-84, and 30979-85.

Joe Alfred Izen, Jr., for petitioners in docket Nos. 17642-83, 4201-84, 38965-84, 40159-84, 22783-85, 30010-85, 35608-86, 479-89, and 8070-90.

Robert Alan Jones, for petitioners in docket Nos. 17646-83, 10931-84, 38757-84, 19464-92, 621-94, and 9532-94.

Declan J. O'Donnell, for petitioners in docket Nos. 10588-83, 27053-83, 28723-84, and 13477-87.

Michael Louis Minns and Enid M. Williams, for petitioners in docket No. 29643-86.

Robert Patrick Sticht and Boris Orlov, for petitioners in docket No. 7205-94.

Robert Patrick Sticht, for petitioners in docket Nos. 20119-84, 17992-95, and 17993-95.

Henry E. O'Neill and Peter R. Hochman, for respondent.


CONTENTS

Page

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.   The Kersting Tax Shelters . . . . . . . . . . . . . . . 12
     A.   Background . . . . . . . . . . . . . . . . . . . . 12
     B.   Respondent's Kersting Project . . . . . . . . . . . 13
          1.   In General . . . . . . . . . . . . . . . . . 13
          2.   Bauspar . . . . . . . . . . . . . . . . . . . 14
     C.   Respondent's Project Settlement Offer . . . . . . 15

II.  The Thompsons' Participation in the Kersting
     Tax Shelters . . . . . . . . . . . . . . . . . . . . . 16
     A.   The Thompsons' Tax Returns . . . . . . . . . . . . 16
          1.   Prepetition Years--1977 and 1978 . . . . . . 16
          2.   Years Before the Court . . . . . . . . . . . 16
               1979 . . . . . . . . . . . . . . . . . . . . 16
               1980 . . . . . . . . . . . . . . . . . . . . 17
               1981 . . . . . . . . . . . . . . . . . . . . 17
          3.   Years Following Those Before the Court . . . 17
               1982 . . . . . . . . . . . . . . . . . . . . 17
               1983 . . . . . . . . . . . . . . . . . . . . 18
               1984 . . . . . . . . . . . . . . . . . . . . 18
               1985 . . . . . . . . . . . . . . . . . . . . 18
     B.   Examination of the Thompsons' 1978-1981 Returns . . 19

III. The Test Case Litigation and the Thompson Settlements . 22
     A.   Selection of the Test Cases . . . . . . . . . . . 22

B. Deterioration of the Thompson-Kersting Relationship . . . . . . . . . . . . . . . . . . . 23
C. The Thompsons Engage DeCastro, Who Settles Their Cases . . . . . . . . . . . . . . . . . . . . 25
D. IRS Activity Regarding the Thompsons' 1983-85 Returns . . . . . . . . . . . . . . . . . 30
E. The Reporting and Resolution of the Thompsons' Deficiency Interest Payments for 1986 and 1987 . . 33
F. The Thompson Settlement Revised as Trial Approaches . . . . . . . . . . . . . . . . . . . . 35
G. Trial and Entry of Decisions . . . . . . . . . . . 38
H. Discovery and Disclosure of the Thompson Settlements . . . . . . . . . . . . . . . . . . . . 42
I. Implementation and Effects of the Final Thompson Settlement . . . . . . . . . . . . . 52
J. Respondent's Disciplinary Action Against Sims and McWade . . . . . . . . . . . . . . 57

IV. Ninth Circuit Remand and Subsequent Proceedings . . . . 58
A. Ninth Circuit Orders in the DuFresne Case . . . . . 58
B. Evidentiary Hearing and Opinions After the Remand in DuFresne . . . . . . . . . . . 60
C. The Ninth Circuit's Opinion and Mandates in These Cases . . . . . . . . . . . . . 64
D. Proceedings Following Remand . . . . . . . . . . 67
E. Further Disciplinary Proceedings . . . . . . . . . 68

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Preliminary Comments . . . . . . . . . . . . . . . . . . . . 70

I. Procedural Issues Following Remand . . . . . . . . . . . 77
A. Procedural Posture . . . . . . . . . . . . . . . 78
B. Law of the Case . . . . . . . . . . . . . . . . . 79
C. Parties Before the Court . . . . . . . . . . . . . 80
D. Burden of Proof . . . . . . . . . . . . . . . . . 81

II. Defining and Applying the Thompson Settlement . . . . . 84
A. Overview . . . . . . . . . . . . . . . . . . . . 84
B. Areas of Agreement . . . . . . . . . . . . . . . 86
C. Starting Point: The Thompsons' Settlement of Proposed Deficiencies for 1979-1981 . . . . . . 88
1. Respondent's Position . . . . . . . . . . . 88
2. Petitioners' Position . . . . . . . . . . . 90
3. Analysis . . . . . . . . . . . . . . . . . 91
D. Other Benefits Relating to the Thompsons' 1981 Tax Year . . . . . . . . . . . . . . . . . . 99

1.    Elimination of the Thompsons' Late
Filing (Non-Kersting) Addition for 1981 . . . 99
2.    Respondent's Failure To Address the
Bauspar Issue in the Thompsons' Statutory
Notice for 1981 . . . . . . . . . . . . . . . 100
E.   Benefits to the Thompsons Relating to Years
Other Than 1979-1981 . . . . . . . . . . . . . . . 100
1.    In General . . . . . . . . . . . . . . . . . 100
2.    The Thompsons' Escape From Kersting
Liability with Respect to 1982 . . . . . . . 102
3.    The Thompsons' 1983 Kersting Deficiency
and the Disappearing Statutory Notice . . . . 108
4.    The Thompsons' 1983-85 Bauspar
Deductions . . . . . . . . . . . . . . . . . 109
5.    The Thompsons' Deduction of Prepaid
Interest on Their 1986 and 1987 Returns . . . 111
1986 . . . . . . . . . . . . . . . . . . . . . 111
1987 . . . . . . . . . . . . . . . . . . . . . 115
6.    The Thompsons' Attorney's Fee
Deduction for 1993 . . . . . . . . . . . . . 117
7.    The Thompsons' Failure To Report
Tax Benefit Income for 1993 . . . . . . . . . 119
8.    Payment of Witness Fees to Mr. Thompson . . . 122
9.    Release of Lien on the Thompsons'
Property and Other Intangible Benefits . . . . 123
F.   The Percentage Reduction Summarized . . . . . . . . 125
G.   Additional Relief . . . . . . . . . . . . . . . . . 126
1.    Elimination of Non-Kersting Additions . . . . 126
2.    Allowance of Bauspar Deductions . . . . . . . 127
3.    Elimination of Non-Kersting Deficiencies . . . 127
4.    Attorney's Fees . . . . . . . . . . . . . . . 128

III. Interest on Deficiencies and Overpayments . . . . . . . 129

MEMORANDUM FINDINGS OF FACT AND OPINION[2]

BEGHE, <u>Judge</u>:  With this opinion, the Court hopes to provide a template for resolution of the more than 1,300[3] remaining cases

---

[2]This opinion is issued pursuant to the mandates of the Court of Appeals for the Ninth Circuit in Dixon V, revg. and remanding Dixon III.  Dixon III had supplemented our Memorandum Findings of Fact and Opinion in <u>Dixon v. Commissioner</u>, T.C. Memo. 1991-614 (Dixon II), vacated and remanded per curiam sub nom. <u>DuFresne v. Commissioner</u>, 26 F.3d 105 (9th Cir. 1994).  For the record, Dixon I is reported as <u>Dixon v. Commissioner</u>, 90 T.C. 237 (1988), holding that petitioners had failed to establish standing to contest a search of Kersting's office, thereby sustaining the validity of the deficiency notices generated by the information discovered in that search.  Dixon IV, reported as <u>Dixon v. Commissioner</u>, T.C. Memo. 2000-116, provided for awards of attorney's fees under sec. 6673(a)(2) to petitioners in Dixon III.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]In addition to the more than 1,300 open cases, petitioners in 52 of the more than 500 other dockets in the Kersting project in which stipulated decisions were entered, both before and after discovery and disclosure of the misconduct held by the Court of Appeals in Dixon V to have constituted fraud on the Court, have filed motions for leave to file motions to vacate their decisions.  The Court has returned unfiled numerous other such motions because of procedural defects.  Petitioners filing or attempting to file such motions have thereby sought to become entitled to the benefits of the Thompson settlement as mandated by the Court of Appeals in Dixon V.  Motions for reconsideration have been filed in the three dockets addressed in <u>Lewis v. Commissioner</u>, T.C. Memo. 2005-205, in which we denied petitioners' motions for leave to file motions to vacate stipulated decisions in Kersting-related cases.

of petitioner participants in the second generation[4] of tax

shelter programs (the Kersting project) promoted by Henry F.K.

Kersting (Kersting).[5]  During the trial on the merits of the test

cases used to try to resolve the vast majority of the pending

cases in the Kersting project,[6] respondent's trial counsel

Kenneth W. McWade (McWade) (with the knowledge and connivance of

---

[4]In Pike v. Commissioner, 78 T.C. 822 (1982), affd. without
published opinion 732 F.2d 164 (9th Cir. 1984), this Court
sustained respondent's disallowance of all deductions for
interest, losses, and credits claimed by participants in
Kersting's first-generation programs.

[5]For additional information about the Kersting project, see
infra Parts I.A. and I.B.  Before his death on Mar. 4, 2000,
Kersting and the tax shelter programs he promoted were frequently
before the courts.  In addition to those cases cited supra notes
2, 3, and 4, see also, e.g., United States v. Kersting, 891 F.2d
1407 (9th Cir. 1989) (holding that an IRS summons was enforceable
against some Kersting program participants); Richards v.
Commissioner, T.C. Memo. 1997-149, Supplemental Opinion T.C.
Memo. 1997-299 (upholding Kersting project deficiency notice),
affd. without published opinion 165 F.3d 917 (9th Cir. 1998);
Gridley v. Commissioner, T.C. Memo. 1997-210 (denying
petitioners' motions for summary judgment to obtain benefit of
Thompson settlement); Kersting v. United States, 206 F.3d 817
(9th Cir. 2000) (promoter penalties upheld); Kersting v.
Commissioner, T.C. Memo. 1999-197 (sustaining deficiencies
against Kersting personally); United States v. Kersting, 77 AFTR
96-1717 (Bankr. D. Haw. 1996) (denying Kersting bankruptcy
discharge).

[6]In 1986, counsel for the parties in the Kersting-related
cases agreed to a test case procedure, under which a few typical
cases are selected as test cases, while the petitioners whose
cases are not selected as test cases are encouraged to execute a
"piggyback" agreement, i.e., a stipulation to be bound by the
outcome of the test cases.  The majority of petitioners in the
Kersting-related cases executed piggyback agreements.  See the
discussion in Gridley v. Commissioner, supra note 5.

his supervisor, Honolulu District Counsel William A. Sims (Sims)), entered into secret settlements with Luis DeCastro (DeCastro), counsel for test case petitioners John R. and Maydee Thompson (the Thompsons).  The financial terms of the final settlement were much more advantageous to the Thompsons than the settlements generally made available to other petitioner participants in the Kersting project.[7]  The final settlement with the Thompsons was intended to provide refunds of tax and interest paid by the Thompsons under a prior settlement, plus interest thereon, that were to be used--and the bulk of the refunds was used--to pay DeCastro's fees for providing the appearance of his independent representation of the Thompsons at the trial of the test cases.  After this Court upheld respondent's determinations and entered decisions in favor of respondent in all the test cases, see Dixon v. Commissioner, T.C. Memo. 1991-614 (Dixon II), respondent's senior management discovered the settlements, moved this Court to vacate the decisions (including the decisions in the Thompsons' cases) that had not already been appealed to the

---

[7]One nontest case petitioner, Denis Alexander, in exchange for his acting as a witness and serving as an undeclared consultant to McWade during the original trial of the test cases, as described in Dixon III at Findings of Fact V.B. and VI.F., received a settlement even more favorable than that afforded the Thompsons.  Although the Court of Appeals in Dixon V noted Alexander's settlement, the Court of Appeals did not rely on or refer to that settlement in formulating the sanction to be imposed by its mandates.

Court of Appeals for the Ninth Circuit, and requested an evidentiary hearing. After vacating the decisions, the Court denied the motion for evidentiary hearing, entered decisions for the Thompsons in accordance with their final settlement, and reentered or allowed to stand its decisions in the other test cases. The Court thereafter denied motions by test case and nontest case petitioners to intervene in the Thompsons' cases shortly before the new decisions in those cases became final. In DuFresne v. Commissioner, 26 F.3d 105 (9th Cir. 1994) (hereafter DuFresne), the Court of Appeals for the Ninth Circuit vacated the decisions against the other test case petitioners on the ground that the misconduct of Sims and McWade required further inquiry. The Court of Appeals directed this Court to hold an evidentiary hearing to determine: "whether the extent of misconduct rises to the level of a structural defect voiding the judgment as fundamentally unfair, or whether, despite the government's misconduct, the judgment can be upheld as harmless error." Id. at 108.

This Court conducted the evidentiary hearing directed by the Court of Appeals and held that the misconduct of the Government attorneys did not create a structural defect but rather resulted in harmless error. See Dixon v. Commissioner, T.C. Memo. 1999-101 (Dixon III). We imposed sanctions against respondent in the form of relief from the accrual of interest on additions to tax

for negligence as well as relief from additional interest under section 6621(d)/(c) (hereafter, section 6621(c)).[8]

The other test case petitioners again appealed. The Court of Appeals for the Ninth Circuit reversed and remanded our decisions in those test cases in Dixon v. Commissioner, 316 F.3d 1041 (9th Cir. 2003), as amended on March 18, 2003 (Dixon V). The Court of Appeals held that the misconduct of respondent's counsel constituted a fraud on the court and directed this Court to enter decisions "in favor of Appellants and all other taxpayers properly before this Court on terms equivalent to those provided in the settlement agreement with Thompson and the IRS." Id. at 1047. In this opinion, we determine the terms of the Thompson settlement and their application to the Kersting project participants before the Court.

FINDINGS OF FACT

The parties have filed a stipulation of facts for evidentiary hearing on September 20, 2004; a first supplemental stipulation of facts for evidentiary hearing on September 20, 2004; a second supplemental stipulation of facts for evidentiary hearing on November 22, 2004; a third supplemental stipulation of

_____

[8]Sec. 6621(d) was redesignated sec. 6621(c) by the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744, and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2399.

facts for evidentiary hearing on March 29, 2005; a fourth supplemental stipulation of facts, filed on June 17, 2005, and a stipulation of settled issues, filed on June 22, 2005. The facts stipulated therein are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. The parties have further stipulated that, for purposes of the present opinion, the Court may incorporate its findings of fact as stated in earlier proceedings unless such facts are inconsistent with the opinion of the Court of Appeals in Dixon V or are inconsistent with facts stipulated or proven in proceedings held after the issuance of Dixon V.

I.   The Kersting Tax Shelters

   A.   Background

All the cases before the Court concern proposed deficiencies, additions to tax, and interest that related to petitioners' participation in tax shelter programs promoted by Kersting. All the programs involved both "primary" loans and notes and "leverage" loans and notes with corporations organized by Kersting that have been held to be his alter egos. See Kersting v. Commissioner, T.C. Memo. 1999-197. These notes sometimes bore dates that were long before the date on which the documents were actually executed and even before the date on which the participant informed Kersting he was ready to participate in a particular program. Kersting advised

participants in his programs that the programs created legitimate investments that would entitle participants to interest deductions that they should claim on their individual tax returns.

B.   Respondent's Kersting Project

1.   In General

Kersting's promotion of his tax shelter programs had attracted the attention of the Internal Revenue Service (IRS), which instituted a tax shelter project known as the Kersting project.[9]  In furtherance of that project, respondent sent deficiency notices to more than 1,800 taxpayers who had participated in the Kersting programs.

The IRS established the Kersting project in its Honolulu Appeals Office.  In any given tax shelter project, a project Appeals officer typically works with a project attorney from the District Counsel's Office.  In the Kersting project, McWade, from

---

[9]Tax shelter projects were initiated to deal with the large volume of cases generated by tax shelter examinations during the late 1970s and the early 1980s.  Among the responses of the IRS and the Tax Court were the development of procedures, including tax shelter projects, that were intended to streamline the litigation process, economize on the use of administrative and judicial resources, and reduce the costs incurred by taxpayers in resolving disputes over tax shelter adjustments.  The IRS, Office of Chief Counsel, created the Tax Shelter Branch in the National Office to oversee tax shelter litigation across the country and to organize individual tax shelter projects.  The projects generally focused upon a specific type of tax shelter, such as those promoted by Kersting that constituted the Kersting project.

the Honolulu District Counsel's Office, served as the project attorney.

Once a tax shelter project is assigned to a particular District Counsel's Office, that District Counsel has the authority to settle any individual case in the project. The District Counsel generally is expected to adhere to the official project settlement offer. Nevertheless, the District Counsel has the authority in special circumstances to settle individual tax shelter project cases on a basis different from the project settlement offer.

### 2. Bauspar

One Kersting program that was not part of respondent's Kersting project was known as Bauspar. Kersting had promoted the Bauspar program as a combination savings and low interest mortgage plan. While the precise manner in which the Bauspar program operated for each participant remains uncertain, the total amount of home mortgage interest deducted by Bauspar participants appears to have been overstated.

Respondent's officials believed that there were relatively few participants in the Bauspar program, that there was no easy way to identify participants in the Bauspar program from a review of their income tax returns, and that an investigation of Bauspar deduction claimants would not be cost effective. Accordingly, respondent ultimately decided not to systematically pursue

Bauspar participants through the Kersting project. Respondent's identification of Bauspar participants appears instead to have been a "hit or miss" proposition; although respondent has disallowed some Bauspar deductions claimed by a few Kersting project petitioners, those disallowances have been sporadic.

Because the Bauspar program was not included in respondent's Kersting project, we refer to interest deductions claimed under the Bauspar program as Bauspar deductions rather than Kersting deductions.

C.    Respondent's Project Settlement Offer

Between 1982 and 1988, respondent had in effect an official settlement offer for the Kersting project. In general, the offer permitted participants in the Kersting programs to resolve their cases by agreeing to pay income tax deficiencies that averaged 7 percent less than those determined in their deficiency notices. The offer also released participants from negligence additions and increased interest.

By September 1986, respondent's counsel had agreed to modify the 7-percent reduction settlement offer to incorporate a new feature, called the "burnout", that would apply in cases involving more than one taxable year. Under this procedure, the interest on a taxpayer's total unpaid deficiencies for the first and second years of tax liability would not begin to accrue until the return due date for the second year. The burnout thus

postponed for a year the accrual of interest on the first year's deficiency, thereby reducing the total interest that accrued on the deficiencies. This was accomplished by zeroing out the taxpayer's agreed deficiency for the first year and adding it to the agreed deficiency for the second year.

## II. The Thompsons' Participation in the Kersting Tax Shelters

### A. The Thompsons' Tax Returns

#### 1. Prepetition Years--1977 and 1978

Although the Thompsons participated in one of Kersting's programs during 1977, they did not claim any Kersting-related interest deductions on their income tax return for that year, because their accountant refused to claim those deductions on the return.

The record suggests the Thompsons first claimed Kersting deductions on their 1978 tax return, which was prepared by an accountant recommended by Kersting.

#### 2. Years Before the Court

##### 1979

The Thompsons filed their 1979 tax return, pursuant to an extension, on May 29, 1980. The Thompsons reported Kersting deductions of $39,477 on that return.

### 1980

The Thompsons received an extension of time to file their 1980 tax return until June 15, 1981.  On that return (received by the IRS on June 19, 1981), the Thompsons reported Kersting deductions of $72,840.

### 1981

The Thompsons late filed their 1981 tax return on July 19, 1982, reporting Kersting deductions of $80,782 as investment interest expense.  The Kersting deductions claimed on that return were the principal factor in reducing the Thompsons' adjusted gross income of $113,711 to taxable income of $18,685--a reduction of $95,026.  The Thompsons also reported $8,000 of home mortgage interest expense that was probably attributable to the Bauspar program, in which the Thompsons began participating in April 1981.

### 3.  Years Following Those Before the Court

### 1982

The Thompsons filed their 1982 tax return on May 6, 1983.[10] On that return, the Thompsons reported Kersting (and probably Bauspar) deductions sufficient to reduce their adjusted gross income of $99,364 to taxable income of $4,336--a reduction of

_____

[10]By October 1982, Mr. Thompson had retired as a pilot with Continental Airlines.

$95,028.  Neither petitioners nor respondent have been able to locate a copy of the Thompsons' 1982 tax return.  The 3-year period of limitations under section 6501 expired with no action by respondent concerning the Thompsons' 1982 tax return.

### 1983

The IRS received the Thompsons' 1983 income tax return on July 2, 1984.  The Thompsons reported no tax liability on that return; they also reported Kersting interest expense deductions of $67,620 as well as Bauspar deductions.

### 1984

Respondent received the Thompsons' 1984 income tax return in April 1985.  On that return, the Thompsons claimed Kersting interest expense deductions from two Kersting programs:  "Mahaio" (Mahalo), in the amount of $4,320, and Federated Finance, in the amount of $3,420.  The mortgage interest deduction included in the return also included interest paid pursuant to the Bauspar program.  The Thompsons paid $2,269 as tax shown on the return to be owing.

### 1985

On their 1985 income tax return, the Thompsons reported itemized deductions of $37,932 and reported adjusted gross income of $22,507, resulting in zero taxable income.  Although the Thompsons did not claim any Kersting deductions on the return,

they overstated their mortgage interest expense as a result of their participation in the Bauspar program.

    B.    <u>Examination of the Thompsons' 1978-1981 Returns</u>

The Thompsons experienced audit problems with their 1978 tax return that were due, in part, to their failure to attach to the return a Form W-2, Wage and Tax Statement, showing the amount of income tax that Continental Airlines had withheld from Mr. Thompson's wages.  In early to mid-1986, the Thompsons' personal counsel, Samuel M. Huestis (Huestis), negotiated a settlement of their income tax liability for 1978.  The record does not disclose the terms of that settlement.

On May 5, 1983, the Los Angeles District Director issued a statutory notice of deficiency with respect to the Thompsons' 1979 taxable year, disallowing Kersting deductions of $39,477 and determining a deficiency in tax of $18,161.  The notice of deficiency also determined a negligence addition of $908 under section 6653(a).  On July 11, 1983, the Thompsons filed a pro se petition in this Court seeking a redetermination of the deficiency and addition.

On June 13, 1984, the Honolulu District Director issued a statutory notice of deficiency with respect to the Thompsons' 1980 taxable year, disallowing Kersting deductions of $72,840 and determining a deficiency in tax of $24,838.  On September 4,

1984, the Thompsons filed a pro se petition in this Court seeking a redetermination of the asserted deficiency.

On March 1, 1985, Kersting sent a letter to Kersting program participants stating that he had retained attorney Brian Seery (Seery) to represent them in the Tax Court at no charge to individual petitioners. The letter requested that each Kersting program participant provide written authorization for Seery's representation.[11] Seery's compensation for legal services rendered to Kersting program participants was always paid by one of Kersting's alter ego corporations. On March 20, 1985, Seery entered appearances for the Thompsons in their Tax Court cases for their 1979 and 1980 taxable years. He also entered his appearance for hundreds of other taxpayers.

On May 31, 1985, the Los Angeles District Director issued a statutory notice of deficiency with respect to the Thompsons' 1981 taxable year, disallowing claimed Kersting deductions of $80,782 and determining a deficiency in tax of $36,294.52. The notice of deficiency also determined negligence additions against the Thompsons under section 6653(a)(1) and (2), a late filing addition under section 6651(a)(1), and increased interest under section 6621(c). Respondent did not disallow the $8,000 claimed

---

[11]In a letter to program participants dated Aug. 11, 1986, Kersting recommended that program participants not attempt to resolve their cases on their own and instead rely on counsel he had hired.

as home mortgage interest that was probably attributable to the Bauspar program. On August 13, 1985, the Thompsons filed a pro se petition in this Court seeking a redetermination of the asserted deficiency, additions, and increased interest for 1981.[12]

The Thompsons thus had three of their taxable years before the Court in three docketed cases. Respondent's determinations of the Thompsons' Federal income tax deficiencies and additions for their taxable years 1979-1981 were as follows:

| | | Additions to tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a) | Sec. 6653(a) | Sec. 6653(a)(1) | Sec. 6653(a)(2) |
| 1979 | $18,161 | --- | $908 | --- | --- |
| 1980 | 24,838 | --- | --- | --- | --- |
| 1981 | 36,295 | $4,934 | --- | $1,958 | 50% of the interest due on the deficiency |
| Total | 79,294 | 4,934 | 908 | 1,958 | --- |

Respondent also determined that the Thompsons were liable for increased interest for 1981 pursuant to section 6621(c).

On November 21, 1985, the Chief Judge of this Court assigned all the Kersting project cases to Judge William A. Goffe (Judge Goffe) for trial or other disposition. Subsequent Kersting project cases were automatically assigned to Judge Goffe.

---

[12]The Thompsons apparently filed their petition for their 1981 taxable year pro se, even after Seery had entered his appearance in the earlier cases.

III.  The Test Case Litigation and the Thompson Settlements

A.    Selection of the Test Cases

McWade and Seery planned to use the test case procedure to dispose of the cases of the Kersting program petitioners who wished to contest the deficiencies determined against them by respondent.  Most of these petitioners entered into stipulations of settlement for tax shelter adjustments, also called "piggyback agreements".  Respondent and petitioners who entered into piggyback agreements thereby agreed to be bound by the results in the selected test cases.  On June 10, 1986, McWade and Seery provided the names of the test case petitioners they had selected to Judge Goffe.

Seery and McWade had agreed to the selection of test cases in 14 dockets of seven married couples who had filed joint returns and one individual who had not filed jointly.  Among the couples selected to be test case petitioners were the Thompsons, John R. and E. Maria Cravens (the Cravenses), and Richard and Fiorella Hongsermeier (the Hongsermeiers).

Seery particularly sought to include the Cravenses as test case petitioners because they treated their payments to Kersting as basis reductions that resulted in capital gain upon the termination of their interests in the programs.  The Cravenses

later decided to proceed without counsel and to settle their cases.[13]

Seery also selected the Hongsermeiers as test case petitioners because he mistakenly believed that they had used their own funds, rather than "nontaxable distributions" from Kersting corporations, to repay loans to other Kersting corporations. The Hongsermeiers' 1978-1980 taxable years were before the Court; respondent had failed to audit their 1981 and 1982 taxable years.

There is no clear indication whether it was Seery or McWade who originally proposed the participation of the Thompsons. As noted, the Thompsons' 1979-1981 taxable years were before the Court. Respondent had failed to audit their 1982 taxable year.

B.    Deterioration of the Thompson-Kersting
      Relationship

Around the time Seery and McWade selected the test cases, the relationship between the Thompsons and Kersting deteriorated. Earlier in 1986, the Thompsons' personal counsel, Huestis, had asked Kersting for an accounting of the Thompsons' participation in the Kersting programs. Huestis's request led to a dispute between the Thompsons and Kersting. On June 23, 1986, the Thompsons retained John Chanin, a Honolulu attorney, to help them in their dispute with Kersting. In a letter dated August 23,

---

[13]See infra note 23.

1986, Kersting informed the Thompsons he had turned their file over to his own attorney for collection and further stated:

> The day after you have allowed your attorneys to file suit I will declare all notes which you have executed to our companies in default and begin collection proceedings. * * * The aggregate sum is well in excess of $250,000.00, as you know.
>
>     *     *     *     *     *     *     *
>
> We will NOT provide legal assistance free of cost to you any longer in US Tax Court proceedings. You will have to retain your own attorney to make an appearance for you on February 9/1987 in US Tax Court.

By letter dated August 24, 1986, Kersting notified Seery that he expected to be in litigation with the Thompsons and directed Seery not to "render any services, at our expense" to the Thompsons. On September 10, 1986, Huestis wrote to Seery, notifying him that the Thompsons were seeking substitute counsel and requesting their files. On September 15, 1986, Seery sent the Thompson files to Huestis and informed him that the Thompsons were test case petitioners. Seery indicated that he was withdrawing as the Thompsons' counsel.

On October 28, 1986, Huestis again wrote to Seery to express dissatisfaction with the sufficiency of the Thompsons' files and to warn Seery that his earlier representation of the Thompsons, while he was also apparently representing Kersting, could be viewed as a conflict of interest and lead to an action for "professional negligence". On October 31, 1986, Seery filed

motions to withdraw as counsel in the Thompsons' cases, which the Court granted.

In ruling on a subsequent motion, Judge Goffe observed that there could be a conflict of interest if Seery represented both petitioners and Kersting. Seery subsequently filed motions to withdraw as counsel in the Kersting project cases (both test cases and nontest cases), citing concerns about a possible conflict of interest. The Court granted Seery's motions in November 1986.

C.    The Thompsons Engage DeCastro, Who Settles Their Cases

On or about November 15, 1986, the Thompsons retained attorney Luis DeCastro (DeCastro), who was also a certified public accountant, to settle their Kersting tax issues. Mr. Thompson retained DeCastro to resolve all the Thompsons' Kersting tax years, not only the 1979-1981 years docketed in the Tax Court. The Thompsons provided DeCastro with tax records for all those years. The retainer agreement between the Thompsons and DeCastro provided for a $5,000 fee, which covered only efforts to negotiate a settlement; it did not cover preparation for and conduct of a trial. None of the other petitioners in the Kersting project, whether test case petitioners or piggybackers, incurred any attorney's fees in connection with the preparation and trial of the test cases. Kersting paid all such fees.

Meanwhile, in the wake of Seery's withdrawal, Kersting engaged attorneys Robert J. Chicoine (Chicoine) and Darrell D. Hallett (Hallett) to represent the test case petitioners (other than the Thompsons and the Cravenses) at the Tax Court's trial session in Maui, Hawaii, which had been scheduled to commence February 9, 1987. Chicoine and Hallett agreed to do so with the understanding that they would not represent Kersting. In late 1986, Chicoine and Hallett apparently indicated to McWade and Sims that they intended to challenge the admissibility of evidence that had been seized in the January 1981 search of Kersting's office that became the subject of this Court's opinion in Dixon v. Commissioner, 90 T.C. 237 (1988) (Dixon I). See supra note 2. About the same time, McWade and Sims began to offer 20-percent reduction settlements that were based on the same general approach as their modified 7-percent reduction settlement offer that included the burnout feature.

In December 1986, DeCastro traveled to Hawaii on behalf of the Thompsons and a number of other clients who had participated in the Kersting shelters. There DeCastro, accompanied by Gary Poltash (Poltash), the Thompsons' new accountant, who was not associated with Kersting, began settlement discussions with McWade. Their initial agreement called for a reduction in the Thompsons' 1979-1981 deficiencies of approximately 18.8 percent. The settlement also provided for the elimination of all additions

to tax and for the elimination of the increased interest rate under section 6621(c) for 1981. The burnout would also apply so as to combine the agreed deficiencies for the years 1979 and 1980 in the year 1980. During this trip, DeCastro and McWade also discussed the Bauspar program in which the Thompsons were involved.

On December 23, 1986, McWade signed and sent DeCastro stipulated decision documents in the Thompsons' cases. The transmittal letter stated that:

> As previously indicated, the Decision documents in John R. and Maydee Thompson will not be filed with the Court until the Decision becomes final in the test cases. In the interim, the Thompsons can make an advance payment, as discussed at our conference, and stop the accrual of any additional liability for interest.

On December 30, 1986, DeCastro signed and returned to McWade the executed decision documents agreeing to the reduced deficiencies. Neither McWade nor Sims communicated the terms or existence of the Thompsons' settlement to their superiors.

The result of the pending settlement upon the Thompsons' tax liabilities would have been as follows:

| Year | Income Adjustment | Determined Deficiency | Proposed Settlement | Percentage Reduction |
|------|-------------------|-----------------------|---------------------|----------------------|
| 1979 | $39,477 | $18,161 | --- | |
| 1980 | 72,840 | 24,838 | $34,425 | |
| Total | | 42,999 | 34,425 | 20 |
| 1981 | 80,782 | 36,295 | 30,000 | 17 |
| All years total | | 79,294 | 64,425 | 18.8 |

DeCastro, Poltash, and McWade had also agreed that the Thompsons would be able to deduct the interest payable on the deficiencies agreed to under the settlement by prepaying such interest by December 31, 1986.[14] As of December 31, 1986, the accrued interest on the Thompsons' newly settled deficiencies was $35,275.81 for 1980, and $24,270.62 for 1981--a total of $59,546.43, which the parties rounded to $59,545. Accordingly, the decision documents returned to McWade by DeCastro stated: "By separate cover you will also be receiving a check in the amount of $59,545 representing interest on the tax deficiencies reflected in the decision documents." With a letter dated December 30, 1986, Mr. Thompson sent McWade two checks: check No. 54 for $34,000, and check No. 242 for $25,545, for a total of $59,545. Mr. Thompson's letter stated: "I am at the present time doing the necessary procedures to take care of the balance."

At McWade's direction, IRS personnel in Honolulu prepared payment posting vouchers (Form 3244) allocating the Thompsons' prepayment of $59,545 between the 2 years before the Court,

---

[14]The Internal Revenue Code was amended in 1986 to add a new sec. 163(h) that repealed the deduction for "personal interest". See TRA sec. 511(b), 100 Stat. 2246. Under the new sec. 163(h), 1986 was the last taxable year in which taxpayers could deduct 100 percent of such personal interest. TRA sec. 511(e), 100 Stat. 2249. For 1987, only 65 percent of personal interest was deductible, and the deduction for personal interest was phased out entirely by the end of 1989. Sec. 163(h)(6).

indicating designated interest for 1980 in the amount of $35,275.78 and designated interest in the amount of $24,269.22 for 1981. The entire amount of check No. 242 ($25,545) and $9,730.78 from check No. 54 was applied to 1980; the remainder of check No. 54 ($24,269.22) was applied to 1981. The Thompsons' $34,000 check (check No. 54) was subsequently dishonored. This was reflected as a debit for the Thompsons' accounts for 1980 and 1981. In February 1987, the Thompsons made a replacement payment of $34,340, representing the amount of the dishonored check plus a 1-percent bad check penalty. The replacement payment was restored as a credit as of December 31, 1986.

The Thompsons were the only test case petitioners for whom the IRS processed a prepayment of interest without receiving a concurrent "advance payment on deficiency" to which the interest was attributable.

In January 1987, Chicoine and Hallett filed motions in this Court seeking to suppress the evidence that had been seized in the raids on Kersting's office and to shift to respondent the burden of proof and burden of going forward with evidence. The Chicoine and Hallett motions in effect turned the February 1987 Maui trial session into a hearing on the motions and resulted in a continuation of the trial of the test cases.

On March 13, 1987, McWade sent DeCastro a revised decision document for the Thompsons' 1980 taxable year, making a minor

change that reduced the deficiency for that year from $34,425 to $33,000. McWade later explained: "It must have been I miscomputed something." With this modification of the settlement, the Thompsons' aggregate deficiencies for 1979-1981 were reduced by 20.55 percent of the deficiencies originally determined by respondent (i.e., from $79,294 to $63,000).

On June 15, 1987, DeCastro sent a $63,000 cashier's check "in partial payment of the total amount due" to the Internal Revenue Service Center in Fresno on behalf of the Thompsons. Respondent received the payment of $63,000 on June 17, 1987, and credited it to the Thompsons' 1979 account as an advance payment, less offset of a credit of $775 that was applied to their 1988 tax year. Accordingly, by June 1987, the Thompsons' payments to the IRS with respect to the taxable years 1979-1981 totaled $121,770 ($62,225 as an advance payment of tax, and $59,545 as interest).

D.  IRS Activity Regarding the Thompsons'
    1983-85 Returns

In the meantime, an employee of respondent at the Fresno Service Center in California (with initials A.A.K.) prepared a statutory notice of deficiency (subsequently dated March 17, 1987) disallowing $67,620 of Kersting deductions claimed on the Thompsons' 1983 income tax return. Because the Thompsons had little taxable income that year, the first whole year of Mr.

Thompson's retirement, the deficiency resulting from this disallowance was only $980. There is some indication that the notice of deficiency was mailed and that it caused an inquiry. An internal document of the IRS (Form 4700) reflects a handwritten entry dated May 8, 1987: "No reason to change determination – refiling case." Nevertheless, no petition for the Thompsons' 1983 taxable year was filed in this Court, and the deficiency was never assessed or collected.

On October 6, 1987, Revenue Agent Carolyn Speers (Speers), based in San Jose, California, audited the Thompsons' 1984 income tax return and noted $7,740 of Kersting deductions claimed on the return. On that date, she wrote the Thompsons a letter proposing to dispose of the Kersting issue identified on the return consistent with respondent's general 7-percent reduction settlement proposal. In her letter, Speers also requested additional information regarding the Thompsons' participation in the Kersting tax shelter programs, including a request for a copy of the Thompsons' 1985 income tax return.

Speers did not receive a response from the Thompsons to her October 6, 1987 letter nor to a followup letter dated November 17, 1987. On November 27, 1987, Mr. Thompson called Speers to report that he had forwarded her request to DeCastro.

On December 23, 1987, DeCastro sent Speers an executed copy of the 7-percent reduction settlement agreement for 1984, along

with a power of attorney executed by the Thompsons for the taxable years 1984 and 1985, and a Form 872-A, Special Consent to Extend the Time to Assess Tax.  Because DeCastro did not include the requested additional information or a copy of the Thompsons' 1985 return, Speers declined to proceed on the basis of the 7-percent reduction settlement.  Instead, by letter to DeCastro dated January 12, 1988, Speers proposed to dispose of the Thompsons' 1984 year by disallowing the claimed Kersting interest expense deductions in their entirety.  She again requested a copy of the Thompsons' 1985 return "to verify that interest from Kersting was not deducted in this year."

Beginning October 6, 1987, and continuing through February 24, 1988, Speers documented (in her case history worksheet) telephone or written contact in the course of her examination of the Thompsons' 1984 income tax return with the Thompsons, DeCastro, Philip Hoskins (of DeCastro's firm), and an accountant named "Rick."  Speers's case history worksheet reflects no contacts with McWade, Sims, or any other of respondent's counsel.

By letter dated February 22, 1988, DeCastro agreed to a complete disallowance of the $7,740 of Kersting deductions claimed by the Thompsons for 1984 and the resulting deficiency of $1,863.  The Thompsons paid the deficiency and interest; by

virtue of this disposition of the matter, respondent issued no notice of deficiency to the Thompsons for 1984.

On March 4, 1988, DeCastro sent Speers a copy of the Thompsons' 1985 income tax return. As noted above, the Thompsons' 1985 income tax return did not reflect any Kersting deductions (although it did include Bauspar deductions). In a letter dated March 25, 1988, Speers notified the Thompsons that she "was able to verify that interest from the Kersting project was not deducted" on that return. Respondent issued no notice of deficiency to the Thompsons for 1985.

E.   The Reporting and Resolution of the Thompsons'
     Deficiency Interest Payments for 1986 and 1987

The Thompsons claimed their $59,545 interest payments to the IRS as an itemized interest deduction on Schedule A - Itemized Deductions of their 1986 income tax return. However, because their adjusted gross income for that year was relatively low, the Thompsons were able to use only $16,251 of the $59,545 deduction. The Thompsons did not claim any Kersting or Bauspar deductions on their 1986 return.

Poltash prepared the Thompsons' 1987 income tax return. On that return, the Thompsons deducted $27,914 as interest paid to the IRS. That figure represents 65 percent of $42,945. See supra note 14. Apparently, the Thompsons were attempting to carry over the unused portion of the interest deduction of

$59,545 from their 1986 taxable year.[15]  The Thompsons did not claim any Kersting or Bauspar deductions on their 1987 return. Poltash did not discuss the preparation of the Thompsons' 1986 or 1987 returns with McWade or Sims.

Revenue Agent Speers examined the Thompsons' 1986 income tax return.  She asked about the $59,545 interest deduction in letters to the Thompsons dated February 26 and March 25, 1988. In a telephone conversation with Speers on May 23, 1988, Mr. Thompson explained the $59,545 interest expense deduction to her satisfaction.  Speers closed the examination of the Thompsons' 1986 return without making any adjustments to the return.  Her examination workpapers reflect her notation that "TP paid large interest to IRS on Schedule A--verified per transcripts."

In June 1989 a revenue agent[16] screened the Thompsons' 1987 income tax return for Kersting deductions.  The return bears a stamp stating "Income Tax Survey After Assignment", meaning that the agent saw nothing obvious for examination and returned the

---

[15]Although Poltash claimed to lack any recollection of his attempt to claim the interest deduction, he conceded the $42,945 amount might have represented an attempt to claim for 1987 the portion of the $59,545 claimed on the 1986 return that produced no tax benefit to the Thompsons.  We note a slight discrepancy between the amount of the deduction actually used on the Thompsons' 1986 return ($16,251) and the figure underlying the $42,945 "carryover" for 1987 ($59,545 - $42,945 = $16,600).

[16]The signature of the examining agent is difficult to decipher; it appears to be "Art (or Pat) Taylor."

1987 return to files without examining it or transmitting it for examination.

F.    The Thompson Settlement Revised as Trial Approaches

Although Chicoine and Hallett ultimately recommended that their test case clients accept respondent's 20-percent settlement offer, Kersting disagreed and replaced Chicoine and Hallett with attorney Joe Alfred Izen, Jr. (Izen) in April 1988.  Counsel on both sides began to prepare for trial, which was scheduled for January 1989 in Honolulu, Hawaii.

In an order dated August 30, 1988, the Court granted McWade's motion to depose Kersting.  In October 1988, while in Honolulu for the Kersting deposition, DeCastro met McWade to discuss the Thompson cases.  DeCastro told McWade he wanted to withdraw the Thompsons from the test case trial.  DeCastro's reason for withdrawing the Thompsons was to avoid their having to pay the fees and expenses of the trial and to enable them to take the settlement they had already agreed to.  McWade wanted to keep Mr. Thompson as a party to the trial because he was a test case petitioner who was represented by an attorney, DeCastro, who had not been hired and paid by Kersting.  From respondent's standpoint, there was also a benefit to having, as a party witness, a participant in the Kersting program who was feuding with Kersting and could be expected to testify against him.

Recalling the withdrawal of Seery, Sims was concerned by the potential conflict of interest from Kersting's paying the fees of the attorney representing the test case petitioners. Accordingly, he wanted to keep DeCastro in the trial of the test cases as an independent attorney, paid by the taxpayer, to provide an apparent safeguard against the trial appearing to be slanted toward protecting the promoter's (as opposed to petitioners') interest.

McWade and DeCastro also apparently discussed the status of an outstanding Federal tax lien on the Thompsons' house (unrelated to their participation in Kersting shelters), which the IRS had yet to remove more than a year after the Thompsons had satisfied the underlying liability.[17]  On November 22, 1988, respondent issued a certificate of release with respect to the Federal tax lien on the Thompsons' house.

Shortly before trial of the test cases in this Court in January 1989, McWade and DeCastro reached an oral agreement (the new agreement) calling for reduced amounts of agreed deficiencies for 1979-1981 of zero, $15,000, and $15,000, respectively.  The purpose of the reductions was to compensate the Thompsons for the cost of having an attorney represent them at the trial of the

---

[17]Under sec. 6325(a)(1), the IRS was required to release the lien not later than Oct. 7, 1987, 30 days after the liability had been satisfied.

test cases. DeCastro estimated that his legal fees for
representing the Thompsons at the trial of the test cases would
be approximately $60,000.[18]  It was estimated that the newly
agreed reductions would generate approximately $60,000 of refunds
to the Thompsons from the $121,770 they had paid earlier toward
satisfaction of the deficiencies and interest under the earlier
settlement.  The new agreement also preserved the Thompsons'
chances to prevail on the merits of the litigation.  McWade and
DeCastro agreed that if the results of the trial were more
favorable to the Thompsons than the new agreement, the Thompsons
would be entitled to the results of the trial.

When the new agreement was reached, respondent's official
settlement policy still provided for a 7-percent reduction in
determined deficiencies, elimination of the negligence penalty,
and other minor concessions, although, as the time for trial
approached, some nontest case petitioners' attorneys continued to
negotiate 20-percent reduction settlements.  The new agreement,

---

[18]As petitioners point out, DeCastro was somewhat
inconsistent in his recollection of his proposed billing.  On
June 2, 1992, he initially denied that the new agreement was
designed as a mechanism for respondent to pay his fees, but he
admitted to the contrary 8 days later.  On Aug. 11, 1992,
DeCastro recalled estimating that it would cost a minimum of
$30,000 to try the Thompsons' case.  After being shown documents
indicating he had billed the Thompsons for more than $30,000,
DeCastro said he had told McWade that his fees would be roughly
$65,000.  As respondent points out, DeCastro's bills to the
Thompsons, as of Nov. 29, 1989, totaled $58,738.20.

however, reduced the Thompsons' deficiencies for the years at issue from the originally determined $79,294 to $30,000--a reduction of 62.17 percent. The new agreement substantially deviated from respondent's official settlement policy and from the 20-percent reduction settlements obtained by DeCastro and Chicoine and Hallett and other attorneys on behalf of other clients. None of Sims's or McWade's superiors approved the new agreement. To the contrary, Sims's and McWade's superiors did not discover the new agreement until after this Court had tried the test cases, issued its opinion, and entered its initial decisions therein.

G. Trial and Entry of Decisions

The trial of the test cases was conducted before Judge Goffe from January 9 through January 27, 1989, at Honolulu, Hawaii. Neither Sims, McWade, nor DeCastro informed Judge Goffe, the National Office, the Regional Office, or Izen of the Thompson settlement or the Cravens settlement before or during the January 1989 trial of the test cases, or thereafter.

The Government paid the travel, food, and lodging expenses of Mr. Cravens and Mr. Thompson while they were in Hawaii. Mr. Thompson's reimbursed expenses amounted to $1,105.13. We stated in Dixon III, n.53: "Inasmuch as respondent subpoenaed all the test case petitioners, it is assumed they were all reimbursed for their expenses." Although there is no evidence in the record

that any other test case petitioner, other than Mr. Cravens and Mr. Thompson, was reimbursed by the Government for the expenses of attending the test case trial, neither is there any record evidence that any or all of the other test case petitioners who requested reimbursement of their trial attendance expenses had their requests denied, or indeed that requests for reimbursement were made by any such petitioners.

Around the time of the 1989 trial, DeCastro asked McWade to arrange for the Thompsons to receive a refund of $30,000 of their advance payments. In a memorandum dated April 10, 1989, McWade requested respondent's administrative officials to process a $30,000 refund to the Thompsons. On July 11, 1989, the Government issued a refund check of $30,000 to the Thompsons. The Thompsons endorsed the check to DeCastro Law Corp. without depositing it in their own checking account. The Thompsons did not claim a deduction on their 1989 return for the $30,000 they paid DeCastro.

On August 3, 1989, DeCastro wrote a letter to McWade confirming the revision of the Thompson settlement that had been agreed to before the trial of the test cases. DeCastro's letter states in pertinent part as follows:

Re: Jack and Maydee Thompson

Dear Ken:

Please confirm following is our agreement with respect to settlement of above taxpayer's cases for open years:

We have agreed that the total taxes due for all the open years are $15,000 for 1980 and $15,000 for 1981.

Further, in the event a final decision in this case is more favorable they are to receive the benefit of such decision.

Please sign below so I can have for my files.

McWade signed the letter and returned it to DeCastro.

On August 24, 1989, DeCastro wrote McWade requesting him to arrange for the Thompsons to receive the balance of their refund. McWade replied that the balance would not be released until the Tax Court had issued its opinion, and DeCastro so informed the Thompsons. DeCastro told the Thompsons that, because the IRS would be paying interest, he believed it was fair to add interest to the Thompsons' bill.

On or about November 6, 1989, McWade received an undated letter from Mr. Thompson, which stated in pertinent part as follows:

Dear McWade:

There are some questions in mind that I feel you can help me answer.

\* \* \* \* \* \* \*

I received a check from IRS in the amount of thirty
thousand dollars--($30,000).  I endorsed this over to
DeCastro Law Corp; this did not retire the billed
amount.  I am completely amazed at the billings we are
receiving.  I am now in receipt of additional billings
that exceed realistic amounts.  In fact the total comes
to sixty six thousand two hundred forty three and
66/100 dollars ($66,243.66).  At some point I know a
reconciliation will come.  Luis [DeCastro] says don't
be concerned.  I am very concerned, I am the one being
billed.

* * * * * * *

Most emphatically I did not expect to be a channel
through which IRS funneled funds to any law firm.
Certainly not in this magnitude.  I have the feeling at
this point that I am correct in this--the bill is to
[sic] much.  I want to know the exact legal position I
occupy.  We have been frustrated long enough.  We wish
to close this chapter.

DeCastro wrote to Huestis on November 17, 1989, stating, in
pertinent part:

Thank you for your letter regarding the matter of
the Thompsons' fees.  As I have told Jack, we are
looking for payment of his fees to the IRS, not him.  I
am enclosing a copy of my letter to him in this regard
for your information.

DeCastro sent a similar letter to the Thompsons on the same
date.

On December 11, 1991, the Court issued its opinion in Dixon
v. Commissioner, T.C. Memo. 1991-614 (Dixon II), sustaining
almost all of respondent's determinations that the Kersting
programs at issue lacked merit for tax purposes.

On March 13, 1992, the Court entered decisions against petitioners in the test cases in accordance with its opinion. On May 14, 1992, the test case petitioners--other than test case petitioner Ralph J. Rina (Rina) and the Thompsons and the Cravenses--appealed the decisions in their cases to the Court of Appeals for the Ninth Circuit.

H.    Discovery and Disclosure of the Thompson
      Settlements

On May 8, 1992, Sims and McWade, by memorandum, requested the San Francisco Appeals Office to process the Thompsons' account administratively in accordance with the Thompson settlement, not the Tax Court's decisions.  On May 22, 1992, Danny Cantalupo, Regional Director of Appeals for the Western Region, informed Peter D. Bakutes (Bakutes), Deputy Regional Counsel for Tax Litigation for the Western Region in San Francisco, of Sims's and McWade's request to process the Thompson settlement.  Bakutes informed Benjamin Sanchez (Sanchez), the Western Regional Counsel in San Francisco, who informed officials in the National Office of the Office of Chief Counsel in Washington, D.C.  The circumstances surrounding the Thompson settlement became a matter of widespread concern within the IRS.

On May 29, 1992, Sims, at the direction of Sanchez, informed DeCastro by letter that the Thompson settlement would not be honored, and that assessments would be made in accordance with

the decisions entered on March 13, 1993, pursuant to Dixon II. The letter advised that assessment of the taxes owing, plus statutory additions and interest, would be "approximately $302,396.12." The letter further noted: "Of course, your clients' advance payments will be credited toward the assessments."

DeCastro had several telephone conversations with respondent's officials, in which he maintained that the Thompson settlement, as memorialized in the August 3, 1989 letter agreement, was an enforceable contract, and that he was prepared to appeal any decision to the contrary.

Bakutes prepared a motion that was filed in this Court on June 9, 1992, seeking leave to vacate the decisions entered in the Thompson cases, as well as the Cravens and the Rina cases. Respondent requested the Court to conduct an evidentiary hearing to determine whether the agreements with the Cravenses and the Thompsons had affected the trial of the test cases or the ensuing decisions of the Court.

On June 10, 1992, Judge Goffe granted respondent's motions to vacate filed in the Thompson and the Cravens cases. That same day, Bakutes called DeCastro to tell him that the decisions in the Thompson cases had been vacated. During this call, DeCastro told Bakutes that in 1988 McWade had reduced the Thompsons' deficiencies to keep the Thompsons in the case. Although he had

earlier told Bakutes that attorney's fees were not awarded in the settlement, DeCastro admitted in this conversation that the deficiencies were reduced to pay the Thompsons' legal fees for his representation of them in the test case trial.

On or about June 11, 1992, Sanchez decided that Sims and McWade should no longer have any authority over the Kersting cases and that the cases should be assigned to other attorneys who had been involved in the Kersting project. Bakutes accordingly reassigned the 14 test case dockets to Thomas A. Dombrowski (Dombrowski) and the nontest cases to Henry E. O'Neill (O'Neill).

On June 22, 1992, Judge Goffe denied respondent's request for an evidentiary hearing and ordered the parties to file agreed decisions with the Court, "or otherwise move within 30 days of the date hereof."

In a separate order filed on the same date, the Court denied respondent's motion to vacate the decision filed in Rina's case, stating:

> The Court has reviewed the testimony of Cravens, the testimony of Thompson, the stipulated facts and stipulated exhibits relating to the Cravenses and the Thompsons, and the exhibits offered through Thompson as a witness. The Court finds that these reviewed items had no material effect on the opinion which the Court filed on December 11, 1991, as that opinion relates to petitioner Rina. If the reviewed items were stricken from the record, the Court would file an opinion in all material respects like the opinion it filed on December 11, 1991 (with the exception of certain portions

relating specifically and expressly to the Cravenses or the Thompsons), and the Court's findings, analyses, and conclusions relating to petitioner Rina would remain the same. * * *[19]

During the summer of 1992, respondent's Acting Chief Counsel David Jordan (Jordan) directed two senior attorneys in the Tax Litigation Division in the National Office, Thomas J. Kane (Kane) and Steven M. Miller (Miller), to investigate the Thompson settlement on behalf of the National Office.  Kane and Miller conducted in-house depositions and interviewed various individuals who had participated in the test case trial and the Thompson settlement.

Bakutes assigned Dombrowski to help Kane and Miller in their investigation.  Dombrowski's immediate problem was how to respond to this Court's order of June 22, 1992, that the parties file agreed decisions with the Court or otherwise move within 30 days.

Dombrowski learned that McWade and Sims had denied that the purpose of the new agreement to reduce the Thompsons' deficiencies was to pay DeCastro's fees; instead, they claimed, the lowered deficiencies had something to do with the Thompsons'

---

[19]Rina appealed from this denial.  Unlike the Thompsons, Rina had no settlement agreement with Sims and McWade.  On June 13, 1995, Rina agreed to the entry of a stipulated decision in the amounts originally determined in his statutory notice of deficiency.

investment in Bauspar.[20]  To see whether Bauspar figured in the Thompson settlement, Dombrowski sought the Thompsons' post-1981 tax returns.  By July 13, 1992, he had received the Thompsons' 1983-89 returns and a memo that the Thompsons' 1982 tax return and administrative file had been destroyed.  Dombrowski analyzed the returns to see if they shed light on the Bauspar question raised by McWade's and Sims's contentions.  Although the 1982 tax return was not available, Dombrowski believed it likely that Kersting deductions had been claimed on that return because of the disparity between adjusted gross income and taxable income, and because Kersting deductions were claimed on the Thompsons' 1983 and 1984 returns.  Dombrowski's "Analysis of Subsequent Year Returns" noted the mortgage interest deductions claimed on the Thompsons' 1983-85 returns and further noted "(Bauspar?)."  He also noted that entries that may have reflected the Bauspar deductions had not been audited.  Dombrowski's reason for putting a question mark after Bauspar was that he could not tell from the entries on the returns whether they actually related to Bauspar.

---

[20]In a memorandum dated Sept. 11, 1992, Kane had written: "Sims claimed that McWade had initiated the recommendation to allow Bauspar losses so that both Thompson and DeCastro would remain in the case.  * * *  Thus, Sims told McWade to work with the Bauspar numbers in order to give Thompson relief and keep him as a test case."  (Fn. ref. omitted.)  Additionally, in 1992, McWade testified that he reduced the Thompsons' deficiencies on his own to make up for the Thompsons' $80,000 "loss" in the Bauspar program.  We found this testimony not credible.

Dombrowski also noted that the Thompsons appeared to have defaulted on a statutory notice issued to the Thompsons for 1983 disallowing claimed Kersting deductions of $67,620, but that the IRS had failed to assess the resulting deficiency of $980. Dombrowski also noted the May 8, 1987, entry in the Thompsons' file for 1983 that stated: "No reason to change determination – refiling case." Dombrowski believed this entry indicated that someone contacted the Fresno Service Center after receiving and questioning the notice of deficiency for 1983. Because the 3-year period of limitations with respect to the returns he was examining had expired several years earlier, Dombrowski did not attempt to determine why the assessment for 1983 had not been made. He instead focused on preparing a timely response to the Court's June 22, 1992, order in the Thompsons' cases.

On June 24, 1992, Marlene Gross (Gross), an official in the National Office of Chief Counsel, called Bakutes and informed him that, despite the disclosure of Sims's and McWade's misconduct, the Department of Justice (DOJ) would not seek to remand the test cases that had been appealed. The DOJ's decision was based on the Tax Court's refusal to vacate the decision in the Rina case. That refusal indicated to the DOJ officials that the Tax Court probably would not vacate its decisions in the other test cases if asked to do so. Gross also reported to Bakutes that the DOJ, and specifically, the Tax Division, Appellate Section Chief Gary

Allen, wished to offer the same settlement to the test case petitioners on appeal that the Thompsons had received: A 65-percent reduction in deficiencies (an approximation of the reduction of the Thompsons' originally determined deficiencies from $79,294 to the $30,000 figure finally agreed upon). Bakutes was opposed to settling the appealed cases on that basis. There is no evidence that the DOJ made any such settlement offer to the test case petitioners on appeal.

On July 16, 1992, DeCastro filed a motion for entry of decision in the Thompsons' cases, on the terms of his settlement agreement with McWade; i.e., deficiencies of zero, $15,000, and $15,000 for 1979-1981, respectively.

On August 20, 1992, respondent filed objections to DeCastro's motion for entry of decision, together with respondent's own motion for entry of decision. Respondent's motion sought a decision that reflected the original 18.8-percent reduction settlement agreed to by McWade and DeCastro in December 1986.[21]

---

[21]Respondent's motion stated that the December 1986 agreement between DeCastro, Sims, and McWade to reduce the Thompsons' deficiencies by 18.8 percent exceeded the terms of the standard 7-percent reduction settlement offer. Nevertheless, respondent conceded: "Respondent's counsel possessed the authority to make such an offer, and such offer was accepted by petitioners herein as well as others." Respondent also noted the "approximately 20 percent" reduction settlement offers previously made to other participants. Respondent's motion further

(continued...)

Respondent's 11-page motion for entry of decision, with a 15-page supporting memorandum, disclosed to the Court the facts that had been discovered in respondent's investigation. Respondent informed the Court that, before the test case trial, Sims and McWade had agreed to settle the Thompson cases by reducing the Thompsons' deficiencies in amounts sufficient to compensate the Thompsons for their projected attorney's fees. As respondent explained to the Court, Sims and McWade had agreed with DeCastro that

> All settlement refunds in excess of the amounts provided by the December 1986 agreement would go ultimately to the benefit of Mr. DeCastro for payment of his legal fees and costs. Mr. DeCastro would be paid solely from amounts refunded by the Service to Thompson. * * * This "New Agreement", in sum and substance, if not explicitly, was designed, and constituted an agreement by Messrs. Sims and McWade to pay Mr. DeCastro's legal fees and expenses.[22]

---

[21](...continued) indicates that Chicoine and Hallet's motion to suppress evidence was pending when McWade offered the 20-percent reduction settlement to DeCastro in December 1986. Although McWade may have known of Chicoine and Hallet's intent to file such a motion, the motion, in the form of a motion for leave to amend petition, was not filed until Jan. 12, 1987, after Chicoine and Hallett had entered their appearances. Any error in this regard, however, is immaterial, in view of our disposition of this matter.

[22]On brief, petitioners question the assertions in respondent's motion that all settlement refunds "in excess of the amounts provided in the December 1986 agreement" would go to DeCastro. This assertion, however, appears to have reflected respondent's understanding at the time. Once again, in view of our disposition of this matter, any error in this respect is irrelevant.

Respondent asserted that the new agreement was unauthorized and had no legal basis. If respondent's motion had been granted, the Thompsons' deficiencies would have been zero for taxable year 1979, $34,425 for 1980, and $30,000 for 1981.

On August 26, 1992, this Court granted DeCastro's motions for entry of decision in the Thompson cases, thus holding respondent to the pretrial concessions made by Sims and McWade in the new agreement:

| Year | Deficiency | Additions to Tax |
|------|------------|------------------|
| 1979 | --- | --- |
| 1980 | $15,000 | --- |
| 1981 | 15,000 | --- |

The Tax Court's decision for 1981 also relieved the Thompsons of the non-Kersting late filing addition of $4,934.32 under section 6651(a). That addition was the only non-Kersting issue in the Thompsons' docketed cases.

Respondent did not appeal the decisions entered by the Court with respect to the cases of the Thompsons and the Cravenses.[23]

---

[23]The Cravenses, who were not represented by counsel after Seery's withdrawal, had agreed with McWade to deficiencies of $9,782.16 for their taxable years 1979 and 1980, a reduction of only about 6 percent from the originally determined deficiencies of $10,401.45. This settlement was less favorable to them percentagewise than the generally available modified 7-percent reduction settlement offer and did not include the "burnout" feature. On Aug. 25, 1992, this Court entered a decision reflecting the Cravens settlement amounts, but the decision included the stipulation that certain advance payments made by the Cravenses had not yet been taken into account. Late in
(continued...)

The Office of Chief Counsel's rationale for not appealing the Tax Court's entry of the decisions giving effect to the Thompson settlement was set forth in a memorandum dated September 8, 1992, and signed by Kane:

> The Chief Counsel and Deputy Chief Counsel have concluded that, under the circumstances, we have completely fulfilled all applicable ethical and legal obligations with respect to this issue and this litigation. They have also concluded that given the fact that the conduct on the part of our attorneys is significantly less than exemplary, there is nothing to be gained by further prolonging this aspect of the Kersting litigation.

On September 30, 1992, Judge Goffe terminated his recall status as a Senior Judge and retired from the bench. The Chief Judge of the Tax Court reassigned the Kersting project cases to Judge Renato Beghe.

After this Court entered its decisions in the Thompson cases, Izen, who had represented the test case petitioners (other than the Thompsons and Cravenses) at the trial and who was representing them on their appeals, and Robert Patrick Sticht (Sticht), who represents a number of nontest case petitioners, filed separate motions with the Court to intervene in the Thompson and Cravens cases. On November 6, 1992, the Court

[23](...continued)
October 1992, officials in respondent's Western Region proposed closing the Cravenses' cases in such a way as "to cause the taxpayers' 1979 and 1980 accounts to zero out with no further amounts due."

denied their motions to intervene, and Izen and Sticht filed
notices of appeal.

I.    Implementation and Effects of the
      Final Thompson Settlement

This Court's August 1992 decisions enforcing the final
Thompson settlement had a number of financial consequences.  The
Court's decisions not only reduced the Thompsons' deficiencies;
it also reduced the interest that had accrued on those
deficiencies.  In December 1986 and in January 1987, the
Thompsons had paid $59,545 of interest on their originally
settled deficiencies of $34,425 for 1980 and $30,000 for 1981.
Because the Court's decisions giving effect to the new settlement
agreement resulted in deficiencies of only $15,000 for each of
1980 and 1981, the interest that had accrued on those
deficiencies before the Thompsons made their interest payments
was much less than $59,545.  Instead, as of December 31, 1986,
the interest accruals on the $15,000 deficiencies for 1980 and
for 1981 amounted to only $15,370.73 and $12,135.31,
respectively.  As a result, the Thompsons' aggregate payments of
$59,545 in December 1986-February 1987 were more than sufficient
to cover their total deficiencies and interest as eventually
reduced by the final Thompson settlement.

In January 1993, respondent made new assessments against the
Thompsons for 1980 and 1981 that were based upon the decisions

entered by the Tax Court on August 26, 1992. The total assessments for 1980 and 1981 amounted to $57,506.04 (tax and interest for 1980 of $15,000 and $15,370.73, respectively, plus tax and interest for 1981 of $15,000 and $12,135.31, respectively). Respondent applied the $59,545 credit balance resulting from the Thompsons' payments of $59,545 in interest to satisfy their $57,506.04 liability for 1980 and 1981, leaving a small credit balance.

The Thompsons' having remitted $63,000 in June 1987, in respect of their previously settled deficiencies, respondent credited $62,225 of that amount to their 1979 account as an advance payment of tax. Because the Thompsons had no deficiency for 1979 under both the earlier settlements and the Tax Court's decision giving effect to the new settlement, the $30,000 refund issued in July 1989 left a credit balance of $32,225. Accordingly, in February 1993, respondent issued a refund check for $32,225 to the Thompsons. As they had done with their earlier refund, the Thompsons endorsed this refund check to DeCastro, as payment of additional legal fees, without depositing the check in their own checking account.

DeCastro thereafter complained to Dombrowski that the Thompsons were entitled to receive even more from respondent. DeCastro argued that the Thompsons were entitled to receive interest on the $63,000 advance payment (albeit as successively

reduced to $62,225 and then $32,225).  Dombrowski requested

"audit assistance", which he received from George Guzzardo

(Guzzardo), an appeals auditor in respondent's San Diego office,

in determining whether the Thompsons were entitled to the

requested interest.  Guzzardo determined that the Thompsons'

$63,000 remittance on June 17, 1987, was an advance payment

rather than a cash bond.  The distinction is important:  An

advance payment resulting in an overpayment entitles the taxpayer

to interest on the overpayment; conversely, a cash bond does not

earn interest.  Having concluded that the previously refunded

$62,225 was an advance payment, Guzzardo determined that the

Thompsons were entitled to additional interest of $31,511.17 as

of July 31, 1993.  Dombrowski did his own computations, and then

asked Jean Samuels (Samuels), an experienced appeals auditor, to

check his and Guzzardo's figures.  Samuels advised that in the

main she agreed with both Guzzardo's and Dombrowski's

calculations.  Relatively small differences in their results were

attributable to their use of different dates for the accrual of

interest.[24]

On September 17, 1993, Dombrowski sent Bakutes a memorandum

requesting approval to refund the interest on the Thompsons'

---

[24]Samuels saw that the refund included some previously
deducted interest, thus producing tax benefit income, but stated
in her memorandum to Dombrowski, "Most taxpayers would probably
either not know or not remember to include this [tax benefit
income] in income, since they won't get a Form 1099 for it."

overpayments, with a copy to the National Office.  Bakutes approved the refund in an e-mail message to Dombrowski.  In October 1993, respondent issued a refund check to the Thompsons in the amount of $32,116.68.

Finally, in December 1993, respondent issued a refund check of $4,107.93 to the Thompsons for 1980.  The check represented an overpayment credit of $2,257.54 (the amount by which their $59,545 interest payment exceeded their deficiencies and interest for 1980 and 1981 after minor adjustments), plus accrued interest of $1,850.39 on the overpayment credit.

The Thompsons deposited these last two refund checks in their checking account.

The following table summarizes the payments by the Thompsons to respondent as well as the subsequent payments, as refunds and interest on refunds, by respondent to the Thompsons:

Paid by Thompsons:

| | |
|---|---|
| $59,545 | December 31, 1986 and February 17, 1987 payments of interest on deficiencies under original settlement. |
| 62,225 | June 1987 advance payment of deficiencies for 1979-1981 (net of $775 credited to tax year 1988). |
| 121,770 | Total amount paid for years in issue. |

Received by Thompsons:

| | |
|---|---|
| $30,000.00 | Refunded July 11, 1989, pursuant to request of McWade, endorsed to DeCastro. |
| 32,225.00 | Refunded February 19, 1993, pursuant to request of DeCastro and endorsed to DeCastro. |
| 32,116.68 | Third refund check, dated October 22, 1993, for $32,116.68, representing interest on overpayment resulting from advance payment of deficiencies. |
| 4,107.93 | Refund, with interest, of overpayment resulting from application of $59,545 interest payment against 1980-81 deficiencies and interest. |
| 98,449.61 | Total amount refunded by IRS for years in issue. |

In sum, the Thompsons were refunded $98,449.61 of the $121,770 they had paid in deficiencies and interest for 1979-1981. Of the $98,449.61 refunded, $81,225 was paid to DeCastro as legal fees. Of this amount, $62,225 was paid to DeCastro by the Thompsons' endorsement to him of the first two refund checks they received in 1989 and 1993. The Thompsons apparently paid DeCastro an additional $19,000 after receiving the third refund check later in 1993.

On their 1993 tax return, the Thompsons reported both the $32,116 interest income received from the IRS in October and the smaller interest payment of $1,850 received in December. Their return did not reflect the tax benefit arising from the fact that, while they deducted $44,165 of deficiency interest on their

1986 and 1987 returns ($16,251 for 1986 and $27,914 for 1987),
the interest on the reduced deficiencies that were ultimately
assessed in 1993 amounted to only $27,506 ($15,371 for 1980 and
$12,135 for 1981).  Pursuant to written advice from DeCastro, the
Thompsons deducted the fees paid to him in 1993 totaling $51,225
($32,225 + $19,000) in computing their taxable income.  The
description accompanying the deduction claim on the Thompsons'
1993 return was "LEGAL FEES FOR INCLUDABLE INC."[25]

J.     Respondent's Disciplinary Action
       Against Sims and McWade

On July 29, 1993, Sanchez sent notices of proposed
disciplinary action to Sims and McWade.  The notices asserted
that Sims and McWade had violated:  (1) Department of the
Treasury Minimum Standards of Conduct, section 0.735-30(a)(2) (an
employee shall avoid any action which might result in or create
the appearance of giving preferential treatment to any person);
(2) Department of the Treasury Minimum Standards of Conduct,
section 0.735-30(a)(6) (an employee shall avoid any action that
might adversely affect the confidence of the public in the
integrity of the Government); and (3) IRS Rule of Conduct 214.5

---

[25]The reference to "INCLUDABLE INC." has not been
satisfactorily explained, even by Poltash, whose office prepared
the return.  Petitioners urge that the reference is to "an entity
that never existed."  The Court doubts the reference is to an
entity at all, but the Court's question to Poltash, whether the
reference was a shorthand reference to "includable income", as a
justification for deductibility under sec. 212, met with a
protestation of ignorance.

(an employee will not intentionally make false or misleading verbal or written statements in matters of official interest). The notices proposed to suspend both Sims and McWade for 14 calendar days without pay.

McWade retired from the IRS effective October 2, 1993. On November 2, 1993, Acting Chief Counsel Jordan approved Sanchez's proposed disciplinary action. Sims was suspended from duty without pay for 14 days and was transferred to the San Francisco Regional Counsel's Office, where he was assigned nonsupervisory duties as a Special Litigation Assistant in the General Litigation area.

IV. Ninth Circuit Remand and Subsequent Proceedings

A. Ninth Circuit Orders in the DuFresne Case

On June 14, 1994, the Court of Appeals for the Ninth Circuit filed a per curiam opinion, vacating and remanding this Court's decisions in the remaining test cases, on the ground that the misconduct of Sims and McWade required further inquiry. DuFresne v. Commissioner, 26 F.3d at 107. Citing Arizona v. Fulminante, 499 U.S. 279, 309 (1991), the Court of Appeals observed:

> We cannot determine from this record whether the extent of misconduct rises to the level of a structural defect voiding the judgment as fundamentally unfair, or whether, despite the government's misconduct, the judgment can be upheld as harmless error. * * *

Accordingly, the Court of Appeals remanded the remaining test cases to this Court with directions "to conduct an evidentiary

hearing to determine the full extent of the admitted wrong done by the government trial lawyers." Id. It further directed this Court to "consider on the merits all motions of intervention filed by parties affected by this case." Id. Finally, the Court indicated that "All subsequent appeals will be scheduled before this panel." Id.

Notwithstanding its general endorsement of allowing parties in related cases to intervene, the Court of Appeals for the Ninth Circuit dismissed attorneys Izen's and Sticht's appeals from this Court's denial of their motions to intervene in the Thompson and Cravens cases. In an unpublished opinion filed the same day as the DuFresne opinion, the panel of the Court of Appeals that had decided DuFresne explained:

> The Tax Court's August 25 and 26, 1992 decisions entering settlement in the Cravens and Thompson cases, respectively, are final. 26 U.S.C. § 7481(a)(1); Fed. R. App. P. 13. The Tax Court lacks jurisdiction to vacate those decisions. Billingsley v. CIR, 868 F.2d 1081, 1084 (9th Cir. 1989). Because there is no case remaining in which the taxpayers can intervene, this appeal is moot. [Adair v. Commissioner, 26 F.3d 129 (9th Cir. 1994).]

On September 29, 1994, the District Court for the District of Hawaii entered an order in favor of the United States that approved the assessment of penalties of $1,545,201 and $2,230,000 under sections 6700 and 6701 against Kersting for the promotion of abusive tax shelters. Kersting timely appealed.

In December 1994, the Tax Court received the mandate of the Court of Appeals in <u>DuFresne</u>, and the test cases were assigned to Judge Beghe for further proceedings under the mandate.

B.   <u>Evidentiary Hearing and Opinions</u>
     <u>After the Remand in DuFresne</u>

In response to respondent's motion for the evidentiary hearing required by the mandate, this Court, following receipt of the record from the Court of Appeals, set the test cases for a pretrial hearing to be held July 17, 1995.  In furtherance of the Court of Appeals' directive regarding intervention, the Court ordered that notice of the hearing be served on all attorneys who had entered appearances on behalf of nontest case petitioners in the Kersting project.  Ultimately, the Court ordered that 10 cases of nontest case petitioners, each represented by either Izen, Sticht, or attorney Robert Alan Jones (Jones), be consolidated with the remaining test cases for purposes of the evidentiary hearing.  As a result, three groups of petitioners participated in all subsequent phases of the evidentiary hearing: Test case and nontest case petitioners represented by Izen; nontest case petitioners represented by Sticht; and nontest case petitioners represented by Jones.[26]

_____

[26]The group of cases that were consolidated for purposes of the evidentiary hearing initially included the case of William D. and Karen S. Booth, docket No. 28950-88, in which Declan J. O'Donnell (O'Donnell) had entered his appearance.  However, at the start of the evidentiary hearing, the Court granted
                                                   (continued...)

As directed by the Court of Appeals in <u>DuFresne</u>, Judge Beghe conducted the evidentiary hearing at special trial sessions of the Court in Los Angeles, California, from May 13-30 and June 10-26, 1996, and August 18, 1997.  On March 30, 1999, on the basis of the record developed at the evidentiary hearing, the Court issued its supplemental opinion in <u>Dixon v. Commissioner</u>, T.C. Memo. 1999-101 (Dixon III).  The Court held that the misconduct of the Government attorneys in the trial of the test cases did not, in the words of the Court of Appeals for the Ninth Circuit in <u>DuFresne</u>, constitute a "structural defect" in the trial, but rather resulted in "harmless error".  However, the Court imposed sanctions against respondent, holding that Kersting program participants who had not had final decisions entered in their cases would be relieved of liability for (1) the interest component of the addition to tax for negligence under section 6653(a)(1)(B) and (2), and (2) the incremental interest attributable to the increased rate prescribed in section 6621(c).

---

[26](...continued)
O'Donnell's motion to sever the Booth case from the cases consolidated for the evidentiary hearing.  O'Donnell argued that, in light of the theory underlying a motion for summary judgment that he had filed on behalf of the Booths, they had no need to participate in the evidentiary hearing.  In <u>Gridley v. Commissioner</u>, T.C. Memo. 1997-210, the Court denied O'Donnell's motions for entry of decision consistent with the final Thompson settlement.

On March 13, 2000, the Court of Appeals for the Ninth Circuit affirmed the order of the Hawaii District Court that had imposed almost $3 million in penalties against Kersting for the promotion of abusive tax shelters. The opinion of the Court of Appeals states:

> The district court did not err in finding that Kersting knew or had reason to know that his statements concerning the allowability of interest were false or fraudulent. See 26 U.S.C. § 6700(a)(2); * * *. The record indicates that Kersting knew that his tax shelters were sham transactions in which participants could write off approximately twelve dollars for every dollar of actual out-of pocket expenses. Kersting himself indicated in a 1977 "comfort letter" to one of the "nervous nellies" investing in his scheme that these deductions were not legitimate - Kersting warned the individual to "be sure this letter does not get into the wrong hands. If IRS would become aware of the offsetting character of your note you would likely lose your interest deduction".
>
> Kersting also knew that these fraudulent interest deductions originating in a prior version of his tax shelter had been previously disallowed by this Court. See Pike v. Commissioner, 78 T.C. 822 (1982) (denying interest deductions to taxpayers participating in Kersting's tax shelters because the transactions conducted by Kersting's corporations were shams lacking economic substance), affd., 732 F.2d 164 (9th Cir. 1984). After Pike, Kersting made merely cosmetic changes to his tax shelter scheme. * * *

Kersting v. United States, 206 F.3d 817, 819 (9th Cir. 2000).

On March 31, 2000, this Court issued a supplemental opinion, Dixon v. Commissioner, T.C. Memo. 2000-116 (Dixon IV), awarding petitioners some of the attorney's fees they sought for services performed in the evidentiary hearing mandated by the Court of Appeals in DuFresne and denying their motions for additional

sanctions.  In so doing, the Court denied petitioners' requests for the award of attorney's fees under section 7430, on the ground that Dixon III had held that none of them was a "prevailing party" as defined in section 7430(c)(4).  Instead, the Court awarded fees under section 6673(a)(2), which authorizes the Tax Court to require the United States to pay excess costs, expenses, and attorney's fees whenever the Commissioner's attorneys have "multiplied the proceedings in any case unreasonably and vexatiously".

On the same date, the Court entered decisions in the test cases, and the test case petitioners appealed.  The Court also certified for interlocutory appeal the cases of nontest case petitioners represented by Izen, Jones, and Sticht who had also participated in the evidentiary hearing and nontest case petitioners represented by O'Donnell whose cases were the subject of the Court's opinion in Gridley v. Commissioner, T.C. memo. 1997-210.  These nontest case petitioners also appealed.

C.  The Ninth Circuit's Opinion and
    Mandates in These Cases

On November 21, 2001, following extensive motion practice on jurisdiction and other issues, the Court of Appeals set a briefing schedule and confirmed that the cases on appeal would be scheduled before the panel that issued the DuFresne opinion. Following receipt of opening and reply briefs from test case

petitioners,[27] now represented by three sets of attorneys,[28] the

DuFresne panel filed an order indicating that, upon

reconsideration, it would not retain jurisdiction, and directing

the Clerk to schedule the appeal in the normal course of events.

On October 10, 2002, the panel that ultimately issued the opinion

in Dixon V heard oral argument in the test cases.

On January 17, 2003, the Court of Appeals issued its opinion

in the test cases in Dixon v. Commissioner, 316 F.3d 1041 (9th

Cir. 2003), amended on March 18, 2003 (Dixon V), vacating and

remanding the Court's decisions in the test cases, and directing

the further proceedings that have resulted in this opinion.

Citing Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S.

238, 247 (1944), overruled on other grounds Standard Oil v.

United States, 429 U.S. 17, 18 (1976), the Court of Appeals

stated:  "There can be no question here but that the actions of

McWade and Sims amounted to a fraud on both the taxpayers and the

Tax Court."  Dixon v. Commissioner, 316 F.3d at 1046.  The Court

---

[27]On Nov. 20, 2001, the DuFresne panel had filed an order directing that the appeals of nontest case petitioners represented by Izen, Sticht, Jones, and O'Donnell "shall be held in abeyance pending resolution of the appeal in No. 00-70858" (i.e., the test cases).

[28]The three sets of attorneys are Izen, Michael L. Minns, and John A. Irvine and Henry G. Binder.

of Appeals held that "fraud on the court" occurs regardless of whether the opposing party is prejudiced.  Id.[29]

The Court of Appeals further stated:

> We have the inherent power to vacate the judgment of the Tax Court, fashion an appropriate remedy, and sanction a party or its lawyers for willful abuse of the judicial process, particularly when the party or its lawyers have intentionally practiced a fraud upon the Court. * * *
>
> * * * The taxpayers should not be forced to endure another trial and the IRS should be sanctioned for this extreme misconduct.
>
> Conversely, we will not enter judgment eradicating all tax liability of these taxpayers.  Such an extreme sanction, while within the court's power, is not warranted under these facts. * * *

Id. at 1047 (citations omitted).  The Court of Appeals instead reversed the decisions of this Court in the test cases and directed this Court to "enter judgment in favor of Appellants and all other taxpayers properly before this Court on terms equivalent to those provided in the settlement agreement with Thompson and the IRS."  Id.  It left "to the Tax Court's discretion the fashioning of such judgments which, to the extent possible and practicable, should put these taxpayers in the same position as provided for in the Thompson settlement."  Id. n.11.

---

[29]The Court of Appeals acknowledged the contrary holding of the Court of Appeals for the Seventh Circuit in Drobny v. Commissioner, 113 F.3d 670 (7th Cir. 1997), affg. T.C. Memo. 1995-209.  In Drobny, the Seventh Circuit held that proof of fraud on the court requires a showing that the alleged misconduct actually affected the outcome of the case to the taxpayer's detriment.  Id. at 678-679.

On January 21, 2003, respondent's then Chief Counsel, referring to Dixon V, publicly announced: "We will * * * assure that no interest is charged on deficiencies for the period of the appeals to the Ninth Circuit."[30]

On February 3, 2003, Deborah Butler, respondent's Associate Chief Counsel for Procedure and Administration, issued a Chief Counsel notice (CC-2003-008), reminding all Chief Counsel attorneys, in light of the opinion of the Court of Appeals in Dixon V, "to adhere to the highest ethical standards when performing their duties, including when representing the IRS before the Tax Court."

On March 14, 2003, the Court of Appeals issued orders remanding to the Tax Court for further proceedings consistent with the opinion in Dixon V the nontest cases that had been appealed pursuant to their certification for interlocutory appeal. On April 23, 2003, the Court of Appeals issued its mandates with respect to the test cases in accordance with Dixon V.

D.   Proceedings Following Remand

On April 30, 2003, respondent filed a motion for a status conference regarding disposition on remand of the test cases and a group of related nontest cases. On May 1, 2003, this Court

---

[30]The original decisions in Dixon II were entered Mar. 13, 1992; the notices of appeal were filed May 14, 1992; the 90-day appeal period would have expired June 11, 1992.

ordered the parties to file status reports regarding subsequent disposition of the cases. The responses displayed various disagreements between respondent and petitioners concerning not only the scope of the remedy, but the manner of its implementation. For example, the status report of petitioners' counsel Henry Binder states: "Respondent does not come to this Court's fashioning of the equitable remedy ordered by the Ninth Circuit with clean hands and, therefore, has no standing to argue the terms or scope of that remedy."[31] The Court conducted status conferences in Houston, Texas, in August 2003 and in Los Angeles, California, in September 2003 to address petitioners' attempts to settle the cases. The conferences resulted in no settlement.

The parties then engaged in protracted motions practice regarding assertions of privilege by respondent as to some matters sought in discovery and regarding the award of attorney's fees claimed by counsel for petitioners.

On April 5, 2004, petitioners filed motions for an evidentiary hearing. Thereafter, at the behest of the parties, the Court directed further discovery and conducted further hearings. The first hearing took place at Las Vegas, Nevada, in

---

[31]Having considered certain issues raised in the status reports, this Court issued an order dated June 12, 2003, indicating it was "not inclined to consider attempts to disqualify counsel" in any of the cases at issue. We additionally stated: "This Court is not inclined to seek appointment of counsel from the United States Department of Justice to represent respondent in these cases".

September 2004, the second hearing at Los Angeles, California, in November 2004, and the final hearing at Washington, D.C., in March 2005.  By the end of September 2005, the parties had filed their briefs regarding the scope and application of the Thompson settlement.

E.    Further Disciplinary Proceedings

On April 1, 1999, the day immediately following the issuance of the Dixon III opinion, Judge Beghe referred the misconduct of Sims, McWade, and DeCastro to the Committee on Admissions, Ethics, and Discipline of the Tax Court for disciplinary action.[32]  In accordance with the Court's practice in such matters, the referrals were not mentioned in the Dixon III opinion or otherwise publicized when that opinion was issued.

On April 22, 2003, the Court, through the Committee on Admissions, Ethics, and Discipline, issued orders to Sims, McWade, and DeCastro to show cause why they should not be suspended or disbarred from practice before the Court or otherwise further disciplined.  On July 1, 2003, DeCastro resigned from practice before the Court.

_____

[32]On June 26, 1996, at what then seemed to be the close of the evidentiary hearing, Izen had filed a motion requesting this Court to refer the Thompson and Cravens settlements and McWade's settlement with Denis Alexander to the DOJ (Public Integrity Section) for criminal prosecution.  Izen identified approximately 17 alleged crimes associated with these settlements.  By order dated June 26, 1996, the Court denied Izen's motion.

Following complaints filed by petitioners' counsel Minns in response to inquiries by the Dixon V panel at oral argument, the Arkansas State Bar suspended Sims's license to practice for 1 year in February 2004, and the Oregon State Bar suspended McWade's license to practice for 2 years in August 2004. This Court, acting on the orders to show cause and the recommendations of the Committee on Admissions, Ethics, and Discipline, suspended McWade and Sims from practice for 2 years, commencing February 20, 2004.[33] The Director of the IRS Office of Professional Responsibility suspended McWade and Sims indefinitely from practice before the IRS, effective June 9, 2004.

Under Rule 202(c)(1), a practitioner who has been suspended for more than 60 days or disbarred from practice before this Court may not resume practice until reinstated by order of the Court. Under Rule 202(c)(2), if the disciplinary proceeding giving rise to a suspension or disbarment was predicated upon the complaint of a Judge of this Court, a hearing on the petition for reinstatement is to be held before a panel of three other Judges appointed by the Chief Judge. At the hearing on the petition:

> the practitioner shall have the burden of demonstrating
> by clear and convincing evidence that the practitioner

---

[33]The first announcement by the Court with respect to the referrals was the Court's issuance, on Feb. 20, 2004, of a press release that disciplinary action had been taken against McWade and Sims. DeCastro's resignation was not publicized by the Court until issuance of the opinion herein.

has the moral qualifications, competency, and learning
in the law required for admission to practice before
this Court and that the practitioner's resumption of
such practice will not be detrimental to the integrity
and standing of the Bar or to the administration of
justice, or subversive of the public interest.  [Id.]

OPINION

Preliminary Comments

The Court of Appeals has directed that the remaining test
case petitioners "and all other taxpayers properly before this
Court" receive judgments in their favor "on terms equivalent to
those provided in the settlement agreement with Thompson and the
IRS." Dixon v. Commissioner, 316 F.3d at 1047.  The Court of
Appeals has left to this Court's discretion "the fashioning of
such judgments which, to the extent possible and practicable,
should put these taxpayers in the same position as provided in
the Thompson settlement." Id. n.11.

Throughout the proceedings required to implement the
mandates of the Court of Appeals, petitioners, impelled by
outrage and indignation at the fraud on the Court committed by
respondent's attorneys, seem to view the mandates as an
invitation to award damages against respondent.  Without in any
way minimizing the seriousness of the misconduct of respondent's
attorneys, we decline any such invitation.[34]  The mandates do not
call for the recovery of damages by the taxpayers; they call for

[34]In any event, we lack jurisdiction to award damages.
Chocallo v. Commissioner, T.C. Memo. 2004-152.

sanctions against respondent, to be determined in accordance with the ascertainable standard provided by the Dixon V opinion.

We now broach how, in light of the different circumstances of the Thompsons and the various groups of affected taxpayers, we can follow and apply the directive of the mandates. Interpreting the term "same position" used in footnote 11 of Dixon V to mean "same financial position", it might seem, at first blush, that the test case and nontest petitioners cannot be put in the financial position the Thompsons found themselves in as a result of the Thompson settlement. The Thompson settlement was embodied in a sequence of payments and refunds that occurred more than 15 to 20 years ago, when personal interest was fully or partially deductible for income tax purposes, in a different interest rate environment, and in temporal relationships that are not now reproducible with respect to any of the other petitioner participants in the Kersting project. Also, the bulk of those refunds was used to pay legal fees the other test case petitioners were not required to pay for representation in the test case trial.

It should be borne in mind that the Thompson settlement occurred in two distinct phases: In December 1986 into early 1987, McWade and DeCastro arranged to provide the Thompsons a reduction of approximately 20 percent in the originally determined deficiencies; this version of the settlement took

account of respondent's increased litigation risk resulting from Chicoine and Hallett's efforts to suppress the evidence discovered in the IRS raid on Kersting's office.  Other Kersting petitioner clients of DeCastro and Chicoine and Hallett obtained 20-percent reduction settlements from McWade prior to the Court's 1988 opinion in Dixon I, and some other nontest case petitioners thereafter obtained such settlements.  The Thompsons' payments to the IRS in late 1986 and in 1987 were made to satisfy their obligations under the approximately 20-percent reduction settlement arranged by McWade and DeCastro.

DeCastro thereafter played on the fears of Sims and McWade that he would walk away from the test case trial to extort the additional reduction agreed to in late 1988 and early 1989 that would generate the refunds that were to be used to pay his fees for providing legal representation to the Thompsons at the trial. The new Thompson settlement had no rationale quantifiably related to the hazards of litigation or the merits of the case; it was based on the opportunistic estimates of McWade and Decastro of what was needed to bring about a particular financial result that has little or no congruence with the situation in which the petitioners before the Court now find themselves.  The fact that the Thompsons had already made the payments required by the earlier 20-percent reduction settlement provided the fund that was ripening for the taking under the new settlement.  As it

turned out, the overall reduction of approximately 62 percent in the Thompson deficiencies provided by the new settlement was more than enough to produce the approximately $60,000 of refunds McWade and DeCastro thought would be needed to pay DeCastro's original estimate of what his fees would be. As it further turned out, the additional interest on the Thompsons' payments under the original settlement was sufficient to provide DeCastro with an additional fee that he (and perhaps Mr. Thompson) probably felt was justified by his success in keeping the new settlement in effect, as well as leave a surplus to be retained by the Thompsons.[35]

Test case and nontest case petitioners in the main fall into two groups, both of which are now in different situations from the situation of the Thompsons 15-20 years ago. It is the Court's impression that a substantial majority of nontest case petitioners are in the unhappy situation of having followed Kersting's advice to stand pat. They neither settled their cases nor made any remittances in respect of the deficiencies determined against them. With the passage of years and the operation against them of the force of compound interest, they claim that they have been facing financial ruin, with all its

---

[35]The lack of legal rationale and the opportunistic character of the new settlement are emphasized by the fact that it was entered into after the litigation risk that supported the original 20-percent reduction settlement had evaporated with the publication of this Court's opinion in Dixon I.

attendant anxieties; this is because they did not have the foresight or the discipline to invest the chimerical tax savings they had appropriated by using the Kersting shelters to support their original return positions.[36]  On the other hand, there are a minority of petitioners who, without conceding their liabilities, have stopped the running of interest against themselves by prepaying the Kersting deficiencies the IRS had determined against them.[37]  With the passage of time and the operation in their favor of the force of compound interest, this minority of petitioners are entitled, under the Dixon V opinion and mandates, to substantial refunds, and properly so.

A further comment:  The financial burden of petitioners who did not prepay has been substantially ameliorated--but not completely eliminated--by respondent's concession that no interest will be charged on deficiencies for the period of the

---

[36]The bulk of petitioners in the Kersting project appear to have been commercial airline pilots.  There is no evidence in the record of their financial sophistication or lack thereof, either individually or as a group.

[37]The Court understands that this group includes the remaining test case petitioners, with the exception of the Dixons, who received a discharge in bankruptcy.  By collecting the deficiencies from the test case petitioners because of their failure to file appeal bonds, cf. Estate of Kanter v. Commissioner, T.C. Memo. 2006-46, respondent has put those petitioners in the advantageous position of being entitled to collect substantial refunds, on which interest has been accruing and compounding over the years without attracting current annual tax liabilities.  Of course, the interest component of those refunds will be includable in gross income of the recipients when finally paid.

appeals to the Ninth Circuit.  That concession, prompted by respondent's recognition of responsibility for the delay in resolving the Kersting project cases caused by the need to investigate the misconduct of respondent's attorneys, seems appropriate, but also generous.  Even if there had been no misconduct by respondent's attorneys, the appeals filed by test case petitioners, before the misconduct was discovered, would have taken some substantial time beyond June 1992 to resolve.  The amelioration is substantial because it has stopped the further accrual and compounding of interest on the deficiencies for more than 13 years.  The amelioration is not complete because many petitioners have deficiencies going back to the late 1970s and early 1980s.

The bottom line is that, in the absence of the misconduct, petitioners who did not prepay would have been required to pay substantially more than they will be required to pay under the mandates.  Moreover, they will be entitled to pay these reduced amounts many years later than would have been necessary if there had been no misconduct.  As a result of respondent's concession, they have had the use of the money due for their reduced deficiencies for more than 13 additional years.  Stated differently, they have enjoyed for more than 13 years the equivalent of an interest-free loan of the reduced deficiencies and interest they will now have to pay.

In sum, this Court has determined the terms of the Thompson settlement.  Our decisions in these cases will apply those terms to test case and nontest case petitioners alike.  Subject to the review of the Court of Appeals, our opinion and decisions will provide the template for the disposition of the more than 1,300 pending cases in the Kersting project.

The thoughts underlying the foregoing comments have informed our effort not only to determine and apply the terms of the Thompson settlement, but also our effort to put petitioners, to the extent possible and practicable, in positions similar to that provided by the Thompson settlement.  Although it may be impossible to put petitioners in the same position, financial or otherwise, the Thompsons were in 15 to 20 years ago, we observe that the Code provisions for interest on deficiencies and overpayments,[38] in which are embedded the time value of money principles that underlie all financial planning,[39] provide the only available appropriate means of approximating the desired equivalence.[40]

---

[38]Secs. 6601, 6611.

[39]See generally, e.g., Brealey & Myers, Principles of Corporate Finance (7th ed. 2003).

[40]Gokhale & Smetters, "Measuring Social Security's Financial Outlook within an Aging Society", Daedalus 91-92 n.2 (Winter 2006), comment that discounting to present value, an operation integral to giving effect to the time value of money, makes it possible "to place dollars accruing at different points in time

(continued...)

For two reasons, those petitioners who prepaid will receive refunds many times greater than the Thompsons received:  Most of those petitioners probably made payments equal to their originally determined deficiencies, not just 80 percent thereof, like the Thompsons, and their refunds will be exponentially increased by interest accruals because they have had to wait much longer than the Thompsons did to receive their refunds.

On the other hand, those petitioners who, unlike the Thompsons, did not prepay will have deficiencies that will be reduced in the same proportion as the Thompsons' deficiencies were finally reduced under the settlement.  Although they will still have to pay those reduced deficiencies with interest accruing until mid-1992, their interest obligation will have been substantially reduced by respondent's concession.  We conclude these comments by again observing that these petitioners will still be substantially better off financially than they would have been in the absence of respondent's misconduct.  And so should it be, in accord with the sanction the Court of Appeals has fixed as the appropriate judicial response to the misconduct of respondent's attorneys.

---

[40](...continued)
on an equal valuation scale".

I.    Procedural Issues Following Remand

      A.    Procedural Posture

These cases are before the Court pursuant to the DuFresne and Dixon V opinions and mandates of the Court of Appeals for the Ninth Circuit.  They therefore present issues in a procedural posture diametrically different from the standpoint from which we usually redetermine income tax deficiencies or overpayments arising from notices of deficiency or refund claims.  Here, the traditional roles of petitioner and respondent are reversed.  In this phase of the proceedings, it is respondent, not petitioner, whose activities are being questioned.  It is respondent, not petitioners, who is charged with having the necessary records and the personnel who have recollections regarding the matters at issue.[41]  Because of the unique posture of this case, it is respondent, not petitioner, who often argues that a deduction has been properly claimed and allowed (and thus should not be included as one of the taxpayer benefits of the Thompson settlement), while petitioners argue the contrary.

---

[41]It should be noted that, following the remand in Dixon V, neither side called DeCastro, Mcwade, or Sims as a witness.  We understand that DeCastro is seriously ill, so he was not available.  We have no such information about McWade or Sims; perhaps their previous failures to persuade this Court of their credibility discouraged both sides from calling them.

B.   <u>Law of the Case</u>

The Court of Appeals for the Ninth Circuit recently

explained the law of the case doctrine as follows:

> "The law of the case doctrine requires a district
> court to follow the appellate court's resolution of an
> issue of law in all subsequent proceedings in the same
> case."  <u>United States ex rel. Lujan v. Hughes Aircraft
> Co.</u>, 243 F.3d 1181, 1186 (9th Cir. 2001).  The doctrine
> applies to both the appellate court's "explicit
> decisions as well as those issues decided by necessary
> implication."  <u>United States v. Cote</u>, 51 F.3d 178, 181
> (9th Cir. 1995) (quoting <u>Eichman v. Fotomat Corp.</u>, 880
> F.2d 149, 157 (9th Cir. 1989)). * * *  [<u>Al-Safin v.
> Circuit City Stores, Inc.</u>, 394 F.3d 1254, 1258 (9th
> Cir. 2005).]

In relying upon its inherent authority to sanction the IRS by

extending the benefit of the Thompson settlement to all

interested parties, the Court of Appeals by necessary implication

concluded that the doctrine of inherent authority trumps the

doctrine of sovereign immunity (the latter generally prohibiting

the imposition of monetary sanctions against the United States

absent the express consent of Congress).[42]  We therefore are not

concerned with that issue.

---

[42]The principle that a court has inherent power to impose
sanctions is well established.  "It has long been understood that
'[c]ertain implied powers must necessarily result to our Courts
of justice from the nature of their institution,' powers 'which
cannot be dispensed with in a Court, because they are necessary
to the exercise of all others.'"  <u>Chambers v. NASCO</u>, 501 U.S. 32,
43 (1991) (quoting <u>United States v. Hudson</u>, 11 U.S. (7 Cranch)
32, 34 (1812)).

C.    Parties Before the Court

The opinion of the Court of Appeals directs this Court "to enter judgment in favor of Appellants and all other taxpayers properly before this Court". Dixon v. Commissioner, 316 F.3d at 1047.  In a technical sense, the Dixon V opinion and the implementing mandates might be deemed to extend only to those parties who filed notices of appeal.  See Abatti v. Commissioner, 859 F.2d 115, 120 (9th Cir. 1988).  We believe, however, that the Court of Appeals did not intend a technical, restricted application of its opinion and mandates, nor, apparently, do the parties.  Following the hearings in these cases, the parties filed a stipulation of settled issues.  Among other things, that stipulation recites:

> 1.   The Kersting deficiencies of any petitioner who has filed a piggyback agreement with the Tax Court shall be determined in accord with the Ninth Circuit's mandates as implemented by the Tax Court on remand in this proceeding * * *.
>
> 2.   The Kersting deficiencies of any petitioner in a case docketed before the Tax Court who has not filed a piggyback agreement will, absent a showing of cause, be determined in accord with the Ninth Circuit's mandates as implemented by the Tax Court on remand in this proceeding * * *.

We read these stipulations to apply to all open cases of petitioner participants in the Kersting tax shelter programs.  In other words, the parties have agreed--and properly so--that the sanction applies to benefit not only to test case petitioners, but also to nontest case petitioners in all remaining docketed

cases in the Kersting project, whether or not they signed piggyback agreements.

D.  Burden of Proof

In our Dixon III opinion, we noted several factors that impelled us to impose the burden of proof on respondent with respect to whether the misconduct of respondent's attorneys resulted in a fundamental defect or in harmless error.  Those same factors apply to the present proceedings concerning the scope and application of the Thompson settlement.  As in Dixon III, respondent has had direct and immediate access to the critical witnesses and most of the relevant documents since May 1992, when the misconduct of respondent's attorneys first came to light.  Further, respondent conducted an internal investigation of that misconduct, without the participation of outside parties, soon after discovering the misconduct.  Petitioners, on the other hand, have had to rely on discovery and circumstantial evidence, plus whatever evidence respondent has revealed voluntarily. Petitioners have been far less favorably situated than respondent to produce the factual record needed to decide these cases on remand.  Furthermore, and finally, as we have previously observed, these cases are not in the normal deficiency posture, and it is the misconduct of respondent's attorneys that is under review.  Accordingly, we again conclude that the interests of justice are better served by placing the ultimate burden of proof

and persuasion on respondent, and we so hold.[43]  See <u>Rockwell v.</u>

<u>Commissioner</u>, 512 F.2d 882, 885-887 (9th Cir. 1975), affg. T.C.

Memo. 1972-133.

We recognize that imposing the burden of proof on respondent

may put respondent in the difficult position of having to prove a

negative; i.e., that a given outcome or transaction involving the

Thompsons was not a result of the Thompson settlement.  In other

circumstances, when a taxpayer has the burden of proving the

negative of a proposition, such as proving the nonreceipt of

income, the Court of Appeals for the Ninth Circuit requires the

Commissioner to produce at least some substantive evidence

linking the taxpayer to the income-producing activity.  See

<u>Weimerskirch v. Commissioner</u>, 596 F.2d 358, 361 (9th Cir. 1979)

(respondent must offer "some foundational support" of the receipt

of such income), revg. 67 T.C. 672 (1977).  Accordingly, in the

matter at hand, it is appropriate to require petitioners to

---

[43]Petitioners have filed a motion, as supplemented by a
later motion, asking the Court to assign the burden of proof to
respondent on 22 specified issues; in so doing, petitioners aver
that they do not seek a general allocation of the burden of proof
to respondent.  Respondent has objected to these motions, quoting
<u>Kluger v. Commissioner</u>, 83 T.C. 309, 310 n.1 (1984), for the
proposition that the Court "has never, in any context, invoked
such a sanction".  Our action in Dixon III in shifting the
general burden of proof and persuasion to respondent in that
phase of these proceedings belies respondent's objections.  We
have concluded that no useful purpose would be served by
addressing petitioners' motions on an issue-by-issue basis.
Suffice to say we have assigned the burden of proof and
persuasion to respondent on each issue of fact that bears on the
scope and terms of the Thompson settlement.

produce at least some substantive evidence indicating that asserted benefits to the Thompsons are the result of the Thompson settlement, at least when respondent is in the position of having to prove the contrary.  In this regard, it is appropriate for petitioners to rely upon circumstantial evidence, although here, as in other contexts, "'mere suspicion or speculation does not rise to the level of sufficient evidence'".  See United States v. Dinkane, 17 F.3d 1192, 1196 (9th Cir. 1994) (quoting United States v. Stauffer, 922 F.2d 508, 514 (9th Cir. 1990)).

Finally, we believe the factual issues regarding the operative terms and scope of the Thompson settlement, now that the existence and overall significance of the misconduct have been determined, do not present policy considerations that require a heightened standard of proof, such as the requirement of "clear and convincing" proof of fraud imposed by our Rule 142(b) in deficiency cases, that we applied in Dixon III against respondent in an earlier phase of these proceedings. Accordingly, we hold that the quantum or level of respondent's burden is a "preponderance" of the evidence, the traditional quantum or level of proof required under Rule 142(a) and the case law thereunder.[44]  This is the same standard to which we and

---

[44]Petitioners have not sought to allocate the burden of proof to respondent on the ultimate question of whether the Thomson settlement is characterized as a 20-percent reduction in deficiencies, plus the payment of the Thompsons' legal fees, or

(continued...)

other courts have, for many years, held taxpayers on questions of general tax liability, and we believe that this is the appropriate standard to apply to respondent in this phase of the proceedings. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Am. Pipe & Steel Corp. v. Commissioner, 243 F.2d 125, 126-127 (9th Cir. 1957), affg. 25 T.C. 351 (1955).

II. Defining and Applying the Thompson Settlement

A. Overview

In Al-Safin v. Circuit City Stores, Inc., 394 F.3d at 1258, the Court of Appeals reminded us that its opinion may be consulted to ascertain what was intended by the mandates. In Dixon V, the Court of Appeals described the basis of the "secret settlement agreements" with the Thompsons and the Cravenses as follows: "A condition of their settlements required Thompson and Cravens to remain test case petitioners. * * * With respect to Thompson, McWade agreed to have Thompson's tax deficiencies reduced in proportion to his attorney's fees, which exceeded $60,000." Dixon v. Commissioner, 316 F.3d at 1044; fn. ref.

---

[44](...continued)
as a 62-percent reduction. See Part C, infra. We observe that the significant evidentiary facts on this issue are not in dispute, so that the burden of proof does not enter into what we see as a problem of legal characterization. Therefore, the question does not arise whether we should employ some heightened standard of proof, such as "strong proof" or "clear and convincing" proof, that might otherwise arise when a party to a transaction seeks to disregard the form employed. Our resolution of this issue does not depend on the allocation or standard of the burden of proof.

omitted.  The Court of Appeals further described the Thompson

settlement as a "vehicle for paying Thompson's attorney's fees",

notwithstanding McWade's testimony that the settlement "was

attributable to a separate transaction."  Id. at 1045.[45]

The opinion of the Court of Appeals displays its

understanding that the Thompson settlement was a covert

transaction, a "secret settlement agreement" that "was a vehicle"

to provide the Thompsons with advantages--including payment of

attorney's fees through a drastic reduction of deficiencies, and

elimination of Kersting and non-Kersting additions--over and

above those offered to other taxpayers.  Thus, while our sanction

should put the other affected taxpayers in the position of having

received the benefits the Thompsons received, those benefits

should be fairly traceable to the sanctionable conduct of

respondent's counsel, McWade and Sims.  As we informed the

parties in an order dated February 28, 2005:

---

[45]The reference to a "separate transaction" is to the
Thompsons' participation in the Bauspar program.  In his brief to
the Court of Appeals, Izen explained that McWade and Sims had
misled this Court by "denying that the Thompsons [sic] settlement
was a vehicle for paying DeCastro's legal fees for representing
the Thompsons at the trial of the test cases, [and] by testifying
that the Thompsons [sic] settlement was attributable to the
Thompsons' participation in the Bauspar program."  Additionally,
as we observed in Dixon III, "Mr. McWade testified that the
Thompsons' settlement was revised in the summer of 1989 in order
to dispose of the Bauspar issue.  Mr. McWade denied that the
Thompsons' settlement was revised to provide a means for the
Thompsons to pay Mr. DeCastro's attorney's fees."

The mere fact that the Thompsons received a tax benefit is insufficient to enable the Court to conclude that the benefit was part of the settlement. With respect to each item, it is also necessary to show, or find it appropriate to assume, that respondent's counsel played an enabling or facilitating role in procuring or assuring the benefit to the Thompsons.

B.    Areas of Agreement

The parties' stipulation of settled issues, in addition to delineating the beneficiaries of the Court of Appeals' mandates, see supra Part I.C., establishes some common ground regarding the relief to which those beneficiaries are entitled:

> 3.    The "burnout" element of the Thompson settlement is as follows:
>
> > (a)    for taxpayers with 2-3 taxable years before the court, the first year's deficiencies are shifted forward and combined with the deficiencies in the second year then reduced in accord with the Ninth Circuit's mandate; and
> >
> > (b)    for taxpayers with 4 or more taxable years before the court, the first year's deficiencies are shifted forward to the second year and the second year's deficiencies are shifted forward and combined with the deficiencies in the third year, after which all deficiencies are reduced in accord with the Ninth Circuit's mandate.
>
> 4.    No petitioner will incur any penalties stemming from such petitioners's [sic] Kersting deficiencies.

We incorporate the foregoing stipulations in the relief we announce today.[46]

As for the deficiencies themselves, petitioners and respondent have agreed that the originally determined Kersting deficiencies should be reduced in proportion to the monetary benefit the Thompsons received as a result of the new agreement between McWade and DeCastro. As petitioners explain: "To determine a percentage reduction of aggregate deficiencies requires a numerator and denominator, the numerator being the amount the Thompsons actually paid under the settlement and the denominator being the amount they would have paid absent the settlement."[47] We agree, with the initial caveat that, inasmuch as the parties address both interest and Kersting-related penalties elsewhere, we disregard those items in determining what the Thompsons paid (the numerator) and would have paid (the denominator).

---

[46]We do not adopt all aspects of the parties' stipulation of settled issues. See infra note 67.

[47]Actually, the resulting percentage would represent the proportion of proposed deficiencies that affected taxpayers would be required to pay. To obtain the "percentage reduction" it will be necessary to subtract the percentage so found from 100 percent.

C.    Starting Point:  The Thompsons' Settlement
      of Proposed Deficiencies for 1979-1981

      1.    Respondent's Position

Respondent's characterization of the Thompsons' settlement of their 1979-1981 deficiencies, as set forth in a status report dated May 28, 2003, has remained constant throughout the proceedings on remand from Dixon V.  Respondent maintains, "from a substantive standpoint", that the Thompsons' settlement of their 1979-1981 deficiencies "amounted to a 20% reduction of the deficiencies"[48] plus "payment of the Thompsons' attorney's fees incurred with respect to the actual trial of the test cases resulting in the opinion in Dixon v. Commissioner, T.C. Memo. 1991-614 (Dixon II)."  In other words, respondent maintains that the settlement fraction numerator--"the amount the Thompsons actually paid under the settlement"--is $63,000 (the amount of tax the Thompsons remitted to the IRS in June 1987).  In respondent's view, the settlement should not reflect the additional $33,000 reduction in tax plus the accompanying interest reductions that generated the refunds of $30,000 in July 1989 and $32,250 in February 1993[49] that were signed over to DeCastro, nor the interest refunds on the resulting overpayments

_____

[48]More accurately, 20.55 percent (from $79,294 to $63,000).

[49]Respondent applied the remaining $750 to the Thompsons' 1988 tax year.

that funded an additional fee payment to Decastro later in 1993 and still left over something that was retained by the Thompsons.

Respondent argues that, because none of the other petitioners (test case or nontest case) incurred attorney's fees for the test case trial (all such fees were paid by Kersting), those petitioners would receive an economic windfall if we were to use the actual 62-percent reduction in the Thompsons' 1979-1981 deficiencies as the starting point for our remedy. Respondent reasons that the 62-percent characterization would provide a benefit to petitioners (the reduction in their proposed deficiencies by an additional 42 percent) that the Thompsons did not enjoy due to their implicit obligation to turn over the bulk of the resulting refunds to DeCastro as payment for legal services that conferred no discernible benefit to them. Respondent further argues that the relatively small portion of the refunds of tax and interest ultimately retained by the Thompsons ($17,224.61 out of $98,449.61) is rendered even more insignificant by the fact that the Thompsons reported almost twice that amount ($33,966.68) as gross interest income received from the IRS in 1993 on which they paid tax.[50]  In sum, respondent argues, the sweetener embodied in the final settlement

---

[50] Respondent overlooks the fact that the refunds of $33,966.68 of taxable interest income reported by the Thompsons for 1993 were substantially exceeded by the $51,000 deduction for legal fees claimed by and allowed to them for that year.

that was achieved by increasing the deficiency reduction percentage from 20 percent to 62 percent in effect should be disregarded because the refunds generated thereby purchased nothing of value and provided at most a de minimis increase in the Thompsons' net worth.[51]

### 2. Petitioners' Position

In sharp contrast, petitioners view the Thompsons' settlement of their 1979-1981 deficiencies strictly in terms of the percentage reduction in the total amount of tax the Thompsons were required to pay. Thus, petitioners maintain that the starting point for determining the percentage reduction in deficiencies to which they are entitled is 62.17 percent, representing the final total reduction of the Thompsons' proposed deficiencies for the years at issue from $79,294 to $30,000.

In addition to their argument that the form of the Thompsons' settlement of their 1979-1981 deficiencies (62.17-percent reduction) provides the starting point for determining the appropriate sanction in these cases, petitioners dispute respondent's assertion that the payment of DeCastro's fees was

---

[51]A more nuanced adoption and application of respondent's argument might arrive at some percentage between 20 percent and 62 percent by increasing the 20 percent to reflect the amount of the refunds actually retained by the Thompsons or the amount they expected or were expected to retain after their endorsement over to DeCastro of the first two refunds. Neither side has advanced such an argument.

one of the substantive elements of that settlement.  Petitioners urge that the evidence does not support a finding that the Thompsons' use of the refunds generated by the final reduction in deficiencies was restricted in any way.  They point to some inconsistencies in the estimate of total fees that DeCastro had given to McWade, as well as DeCastro's initial reluctance to acknowledge that respondent had arranged to pay his fees.  Accordingly, petitioners argue that the substance of the Thompsons' settlement of their 1979-1981 deficiencies did not depart from the form in which respondent provided it--that is, a reduction of 62.17 percent in the deficiencies originally determined for those years.

### 3.  Analysis

As a threshold matter, we do not believe that the inconsistencies perceived by petitioners outweigh the direct and circumstantial evidence that, in substance, the Thompsons' settlement of their 1979-1981 deficiencies was, in the words of the Court of Appeals, a "vehicle for paying Thompson's attorneys' fees".  The preponderance of the evidence shows that, when they made their final deal, McWade and DeCastro intended that the refunds generated by the final reduction of the Thompsons' deficiencies would go to DeCastro in payment of his fees.  The fact that the Thompsons endorsed the first two refunds--two checks totaling $62,225--directly to DeCastro's law firm confirms

that intention.  In a telephone call with Bakutes on June 10, 1992, DeCastro himself conceded that the refunds were intended as a means of paying his fees.

Although we recognize that the payment of DeCastro's fees was an essential element of the Thompsons' settlement of their 1979-1981 deficiencies, it does not follow that respondent's characterization of that settlement (20-percent reduction in deficiencies plus payment of attorney's fees) must prevail.  From a practical standpoint, respondent overlooks the fact that the refunds generated by the reduction in deficiencies exceeded the legal fees they were intended to defray.  More importantly, inasmuch as the Court of Appeals has taken us to task for twice failing "to equitably resolve" a situation in which respondent's attorneys committed fraud on the court, we believe respondent should be held to the form of the new settlement.  That is, we do not think it appropriate to define the Thompsons' settlement of their 1979-1981 deficiencies only by reference to its asserted substance, which would require respondent to reduce the proposed deficiencies of the affected taxpayers by only 20 percent (this would be the practical effect, because, although respondent would also be required to reimburse the affected taxpayers for attorney's fees, none of the affected taxpayers paid any such

fees).[52] We instead think it appropriate to hold respondent to the form of the transaction adopted by his misbehaving attorneys, i.e., the reduction of the Thompsons' 1979-1981 deficiencies by 62.17 percent, without regard to the fact that the Thompsons used the bulk of the refunds generated thereby to pay DeCastro's fees.

We recognize that, in the usual case, it is taxpayers who are held to the form of the transaction they have adopted; once a party has chosen to organize his affairs in a certain fashion, "he must accept the tax consequences of his choice, whether contemplated or not * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not." Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974). On the other hand, respondent generally may disregard the taxpayer's form, and, if that form is "unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute." Higgins v. Smith, 308 U.S. 473, 477 (1940). We also recognize that, in these cases, the traditional roles of petitioner and respondent have been reversed. Requiring respondent to assume the procedural posture of a taxpayer does not necessarily prohibit respondent from asserting substance over form. We have in mind the following

---

[52]The attorney's fees incurred by petitioners for which respondent may be liable relate to further proceedings required by the misconduct of respondent's attorneys and are in no way analogous to the Thompsons' fees to DeCastro for his representation in the original trial in Dixon II.

comment of Judge Wisdom:  "The taxpayer too has a right to assert the priority of substance--at least in a case where his tax reporting and actions show an honest and consistent respect for the substance of a transaction."  Weinert v. Commissioner, 294 F.2d 750, 755 (5th Cir. 1961), affg. 31 T.C. 918 (1959).[53]

Our difficulty with respondent's assertion of the "priority of substance" arises from the failure of respondent's actions to show "an honest and consistent respect for the substance of [the] transaction."  Here, respondent, through his former attorneys, did not show respect for the substance of the transaction. McWade and Sims tried to hide the settlement from their supervisors, from the other parties, and from the Court.  As we have seen, and the Court of Appeals has noted, Dixon v. Commissioner, 316 F.3d 1044 n.5, when Thompson was about to reveal his settlement in open court, McWade immediately steered him to another subject.  Nor did respondent's attorneys manifest a consistent respect for the substance of the transaction.  In substance, the Thompsons' settlement of their 1979-1981 deficiencies was a vehicle for payment of their attorney's fees, but respondent, again through his former attorneys who perpetrated the fraud, characterized it as a refund of taxes to the Thompsons that was solely attributable to Bauspar.

_____

[53] See Smith, "Substance over Form:  A Taxpayer's Right to Assert the Priority of Substance", 44 Tax Law. 137, 142 (1990).

We therefore reject respondent's assertion of substance over form.  We shall instead apply to respondent the nondisavowal principle of <u>Commissioner v. Natl. Alfalfa Dehydrating & Milling Co.</u>, <u>supra</u> at 149, that a party who has chosen to organize his affairs in a certain fashion "must accept the tax consequences of his choice, whether contemplated or not * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not."  We believe the settlement of the Thompsons' 1979-1981 deficiencies must be applied by giving effect to their receipt of the entire amount of the refunds, rather than by disregarding such receipt as a mere formality in the process of what was, in substance, respondent's manipulation of the tax administrative process to use the Thompsons as a conduit to pay DeCastro's fees.

We are not content to rest our conclusion solely by invoking the nondisavowal principle to hold respondent to the form of the transaction.  To do so might give rise to the implication that we have disregarded the substance of the transaction.  If we did no more than disregard the substance of the Thompson settlement by upholding its form, respondent might well impeach our conclusion by arguing that we thereby would have disregarded the mandate of the Court of Appeals for the Ninth Circuit to put all petitioners "in the same position as provided in the Thompson settlement".

We therefore push the analysis further by observing that our conclusion accords with principles of Federal income taxation developed by the Supreme Court in analogous situations. Specifically, our treatment of the Thompson settlement is analogous to the treatment of taxpayers who are held to have received gross income, even though that income was paid directly to a third party.  Petitioners cite Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929), in which the Supreme Court held that an employer's payment of its employees' income taxes should be recognized as a taxable payment of additional compensation to the employee.[54]

Our conclusion is supported by the recent decision of the Supreme Court in Commissioner v. Banks, 543 U.S. 426 (2005). There, Mr. Banks settled an employment discrimination suit for $464,000 and, pursuant to a contingent fee arrangement, paid his attorneys $150,000 of that amount.  The Supreme Court held that the $150,000 fee amount was includable in the gross income of Mr. Banks, notwithstanding his preexisting obligation to pay

---

[54]We note that the Thompsons did not report as gross income the first refund of $30,000, presumably because it was a refund of tax they had previously paid.  Moreover, they did not claim that amount as a deduction under sec. 212(3) when they endorsed the check for that amount to DeCastro, as a partial payment on account of his legal fees.  Although their failure to claim the deduction operated as a tax detriment to the Thompsons, there is no evidence that their forbearance was in any way related to the deal with McWade.

approximately one-third of his total recovery to his lawyers.[55]
We read the Supreme Court's opinion in <u>Banks</u> as confirming and
applying the general principle that the portion of a settlement
that is dedicated to the payment of the plaintiff's attorney's
contingent fee is still regarded as received by the plaintiff
even though he is not expected or entitled to retain it.

Our conclusion is guided also by the fact that the Court of
Appeals has specifically directed us to provide the equivalent of
the Thompson settlement as a sanction against respondent.  We do
not believe that the Court of Appeals contemplated the
application of this aspect of the Thompson settlement in the way
that respondent urges, that is, as a 20-percent reduction in
proposed deficiencies, together with the hollow requirement that
respondent reimburse the many other affected petitioners for
attorney's fees that in fact they never incurred.  If we did so,

---

[55]We note that in <u>Kenseth v. Commissioner</u>, 114 T.C. 399
(2000), affd. 259 F.3d 881 (7th Cir. 2001), a majority of this
Court upheld respondent's contention that the taxpayers were
chargeable with the receipt of gross income on the portion of a
settlement that was used to pay their attorney under a contingent
fee arrangement.  In <u>Kenseth</u>, the taxable year was 1993, the
taxable year for which, in the matter at hand, respondent
contends that we should disregard as a formality the Thompsons'
receipt of the second refund they used to pay their attorney.

We observe that our hewing to the form of the transaction as
generating refunds of tax and interest to the Thompsons obviates
any argument by petitioners that the Thompsons received a tax
benefit in not being required to report as gross income the
receipt of the refund of tax that enabled them to make their
first installment payment of DeCastro's attorney's fees.

we would not be applying the equivalent of the Thompsons' 1979-1981 settlement; instead we would be applying essentially the same 20-percent reduction settlement that McWade extended to other taxpayers, including other clients of Chicoine and Hallett and DeCastro, the monetary benefit of which respondent would have been content to allow the Thompsons to retain. We believe the modest deficiency reduction percentage urged by respondent would not provide an appropriate sanction for misconduct that the Court of Appeals has held to be a fraud on this Court. To adopt respondent's view would be to ignore the financial terms and effects of the final settlement that was sweetened for the illicit purpose of creating the fund from which DeCastro's trial fees could be paid.

We conclude that the Court of Appeals intended that the Thompsons' "secret agreement" with respect to 1979-1981, to the extent it reflected the reduction of deficiencies to $30,000 for those years, is to be applied as a reduction of 62.17 percent in the Kersting deficiencies of the affected taxpayers, rather than the 20-percent reduction urged by respondent, or some intermediate percentage based upon the actual or expected amounts of the refunds to be retained by the Thompsons after payment of DeCastro's fees. See supra note 51. In terms of the "settlement fraction" discussed above, we begin with a numerator of $30,000 (the total 1979-1981 tax deficiency the Thompsons paid) and a

denominator of $79,294 (the 1979-1981 tax deficiencies the Thompsons would have paid absent the settlement).

D.    Other Benefits Relating to the Thompsons'
      1981 Tax Year

    1.    Elimination of the Thompsons' Late
          Filing (Non-Kersting) Addition for 1981

Petitioners maintain that the denominator of the settlement fraction should be increased by $4,934.32, representing the late filing addition in the Thompsons' statutory notice for 1981 that they would have had to pay absent the settlement of their 1979-1981 tax years. We disagree. Respondent's proposed application of non-Kersting penalties and additions was specific to individual taxpayers, unlike the Kersting-related deficiencies and additions for which all affected taxpayers are liable. For that reason, we believe it is appropriate to limit the benefit of this aspect of the Thompson settlement (relief from liability for non-Kersting additions) to those affected taxpayers who, like the Thompsons, were subject to non-Kersting additions. We therefore deal with this aspect of the Thompson settlement separately from our determination of the percentage reduction in Kersting deficiencies that will apply to all affected taxpayers. See infra Part II.G.1.

2.  Respondent's Failure To Address the
    Bauspar Issue in the Thompsons' Statutory
    Notice for 1981

As discussed above, the Thompsons began participating in the Bauspar program in 1981.  Respondent's notice of deficiency with respect to the Thompsons' 1981 tax year did not disallow the $8,000 claimed by the Thompsons on their 1981 return as home mortgage interest, interest that was probably attributable to the Bauspar program.  By August 1985, when the Thompsons filed their petition in this Court for 1981, respondent was generally precluded from revising the statutory notice to include the Bauspar issue.  See sec. 6212(c)(1).  Because that cutoff date predates the Thompsons' retention of DeCastro by more than a year, respondent's failure to include the Bauspar issue in the statutory notice for 1981 could not have been part of the secret settlement agreement between DeCastro and McWade.[56]

E.  Benefits to the Thompsons Relating to Years
    Other Than 1979-1981

1.  In General

Respondent maintains that the only years covered by the Thompson settlement were the Thompsons' 1979-1981 taxable years before the Court in this proceeding.  Petitioners, on the other

---

[56]Respondent presumably could have raised the Bauspar issue later by seeking leave to amend his answer in the Thompsons' 1981 Tax Court case.  See sec. 6214(a); Rule 41(a); Rule 142(a) (shifting the burden of proof to the Commissioner with respect to the increased deficiency).  For reasons discussed infra in Part II.E.4., we need not concern ourselves with that possibility.

hand, maintain that the Thompson settlement covered a number of years between 1979 and 1993, thereby increasing the percentage reduction in Kersting deficiencies to which they are entitled to 79.95 percent.[57] They base this percentage on their calculation that, absent the settlement, the amount of taxes the Thompsons would have paid respondent for the taxable years 1979-1983, 1986-87, and 1993 was $143,894.10, while the amount they actually paid was $28,894.87 ($30,000 reduced by $1,105.13 that respondent maintains Mr. Thompson improperly received as reimbursement for his travel to Hawaii to testify in the Dixon II trial). We examine various suspect benefits below.[58]

---

[57]In a separate brief, petitioners' counsel Sticht argues for a "cashflow" approach to the calculation of the reduction percentage, which would bring the initial reduction percentage to 86.8 percent of petitioners' aggregate deficiencies, additions, and interest. Without closely following the mechanics of Sticht's calculation, we reject the cashflow approach out of hand. It completely disregards the time value of money principles that underlie our Preliminary Comments. See text accompanying notes 38, 39, and 40, supra.

We also note that, in the course of the evidentiary hearing required by the Dixon V mandates, petitioners' counsel O'Donnell and Jones filed motions for summary judgment of "100-percent discount" as a sanction. We denied the motions and the motions for reconsideration of our denials because of numerous outstanding issues of material fact. With the completion of the evidentiary hearing and issuance of our opinion herein, we now regard petitioners' motions to characterize the Thompson settlement as a 100-percent reduction in the Kersting-related deficiencies as having been denied on the merits.

[58]We note that petitioners do not question the settlement of the Thompsons' 1978 tax year, which was apparently the first year for which the Thompsons claimed Kersting deductions. In any
(continued...)

2.  The Thompsons' Escape From Kersting
    Liability with Respect to 1982

As discussed earlier, the Thompsons claimed Kersting (and probably Bauspar) deductions on their 1982 return sufficient to reduce their adjusted gross income of $99,364 to $4,336. Respondent took no action with respect to that return, and the generally applicable 3-year period of limitations for the Thompsons' 1982 tax year expired in May 1986. Given the fact that the Thompsons did not retain DeCastro until November 1986, respondent's failure to act on the Thompsons' 1982 return before the expiration of the 3-year period of limitations could not have been part of the secret settlement agreement between DeCastro and McWade.

Petitioners nevertheless maintain that the Thompsons' escape from Kersting liability with respect to 1982 is attributable to the DeCastro/McWade agreement. In support of that argument, they point to DeCastro's August 3, 1989 letter to McWade, which states: "We have agreed that the total taxes due for all the open years are $15,000 for 1980 and $15,000 for 1981." (Emphasis added.) Petitioners then argue that the Thompsons' 1982 tax year was still fair game at that time because Mr. Thompson's fraud rendered the statute of limitations inapplicable pursuant to

---

[58](...continued)
event, that settlement was consummated in early to mid-1986, before DeCastro came on the scene.

section 6501(c)(1).  They argue that Mr. Thompson was liable for fraud because he had claimed Kersting deductions even though he believed he wouldn't have to pay the notes.

Petitioners' arguments are farfetched.  Allegations of fraud are serious business.  The grounds for asserting civil fraud were succinctly explained in Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968) (quoting Carter v. Campbell, 264 F.2d 930, 935-936 (5th Cir. 1959)), affg. T.C. Memo. 1966-81:

> "Fraud implies bad faith, intentional wrongdoing and a sinister motive. It is never imputed or presumed and the court should not sustain findings of fraud upon circumstances which at most create only suspicion. * * *  Negligence, whether slight or great, is not equivalent to the fraud with intent to evade tax named in the statute.  The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Mere negligence does not establish either.  * * * "

We amplified these requirements in Fields v. Commissioner, T.C. Memo. 2002-320:

> To succeed in the instant case, respondent must show that he had a reasonable basis for believing that he could prove his allegation of petitioner's fraud by clear and convincing evidence.  See, e.g., Rutana v. Commissioner, 88 T.C. 1329, 1337-1338 (1987).  More particularly, he must show that he had a reasonable basis for believing that he could prove by clear and convincing evidence that petitioner willfully intended to evade a tax she believed to be owing.

In Fields, where we found that respondent lacked a reasonable basis for asserting fraud, we awarded attorney's fees to the petitioner under section 7430.  See also Benson v. Commissioner, T.C. Memo. 2004-272.

When DeCastro wrote to McWade confirming their deal, respondent had not asserted fraud for any of the Thompsons' taxable years that were before the Court, in all three of which the Thompsons had claimed substantial Kersting-related deductions. Respondent, in fact, has not asserted fraud charges against any of the test case or nontest case petitioners with respect to Kersting deficiencies. Nor, for that matter, did respondent even assert fraud charges against Kersting himself, when respondent issued a deficiency notice to Kersting for his failure to report more than $11 million of fee income he received over a 7-year period (1982-88) from the Kersting project petitioners through his alter ego corporations. See Kersting v. Commissioner, T.C. Memo. 1999-197.

Nor do we believe the facts of the Thompsons' case would support an assertion--much less a finding--of fraud against Mr. Thompson. Petitioners point to Mr. Thompson's trial testimony, in which he "admitted that he had taken Kersting deductions while believing the debt to which the deductions related would not have to be repaid." We believe this testimony is true and consistent with our findings in Dixon II and Dixon III regarding the Kersting shelters. We further believe this testimony falls far short of demonstrating, by clear and convincing evidence, that, by claiming the Kersting deductions, Mr. Thompson specifically intended to evade a tax known to be owing. Our skepticism is

based upon our perception that charging Mr. Thompson with fraud in these circumstances would attribute to Mr. Thompson substantially more knowledge of tax law than he ever had.  When his 1982 tax return was filed, Mr. Thompson was a retired airline pilot, who, like more than 1,000 of his colleagues duped by Kersting, unwisely bought into a spurious tax shelter.  Petitioners apparently would have us accept the proposition that Mr. Thompson was familiar with the laws governing the deduction of interest payments where there is some question whether the taxpayer involved is personally at risk.

This Court had substantial opportunity to evaluate the credibility of Mr. Thompson, who testified for 2 days during the evidentiary hearing mandated by DuFresne.  We found no basis for suspecting him of fraud; to the contrary, if he had engaged in fraud, we doubt he would have admitted that he didn't think he was personally at risk on the Kersting notes.  Instead, we concluded that his testimony at the test case trial "was truthful."

More to the point, we believe Mr. Thompson's true beliefs are those shown by his letter to McWade dated November 6, 1989.  In this letter, Mr. Thompson expressed his anger and confusion at the part he had been made to play by the machinations of DeCastro and McWade:

> I received a check from IRS in the amount of thirty
> thousand dollars--($30,000).  I endorsed this over to

DeCastro Law Corp; this did not retire the billed
amount.  I am completely amazed at the billings we are
receiving.  I am now in receipt of additional billings
that exceed realistic amounts.  In fact the total comes
to sixty six thousand two hundred forty three and
66/100 dollars ($66,243.66).  At some point I know a
reconciliation will come.  Luis [DeCastro] says don't
be concerned.  I am very concerned, I am the one being
billed.

* * * * * * *

Most emphatically I did not expect to be a channel
through which IRS funneled funds to any law firm.
Certainly not in this magnitude.  I have the feeling at
this point that I am correct in this--the bill is to
[sic] much.  I want to know the exact legal position I
occupy.  We have been frustrated long enough.  We wish
to close this chapter.

Mr. Thompson's reaction as displayed by this letter is not that

of a willing participant in a fraudulent conspiracy; instead,

it's the outrage of a mark who finally realizes he's been a tool

in somebody else's game.

The two cases cited by petitioners reinforce our conclusion.

In Popkin v. Commissioner, T.C. Memo. 1988-459, affd. without

published opinion 899 F.2d 21 (11th Cir. 1988), and Fried v.

Commissioner, T.C. Memo. 1989-430, affd. 954 F.2d 730 (11th Cir.

1992), the Commissioner determined fraud penalties against tax

shelter promoters who themselves had invested in four types of

tax shelters, involving books, movies, lithographs, and coal

mining.  This Court rejected the Commissioner's fraud

determinations in the book, movie, and lithograph shelters.  The

Court did, however, sustain the fraud penalties against the

promoters for their participation in the coal-mining shelters. These conclusions were based upon their complicity in backdating documents and failing to deliver promissory notes. Here, in contrast, there is no evidence of Mr. Thompson's engaging in any backdating, failure to make delivery, or any other dishonesty "upon which, in large part" we relied in finding fraud in Popkin and Fried.

In sum, there is not now, nor was there ever before, any basis to assert fraud against Mr. Thompson for 1982. Accordingly, the period of limitations for that year expired in May 1986. That being the case, the Thompsons' 1982 tax year was not an open year to which DeCastro's August 3, 1989, letter to McWade could have applied. We find and hold that the Thompsons' 1982 taxable year was not affected by, and was not part of, the Thompson settlement.[59]

---

[59] In all likelihood, the Thompsons' 1982 tax year simply slipped through the cracks as a result of the haphazard operation of the audit lottery. The record in these cases reveals numerous other instances in which respondent failed to catch all the taxable years of all the Kersting deductions claimed by participants in Kersting's shelters. For example, test case petitioners Richard and Fiorella Hongsermeier escaped audit for their 1981 and 1982 taxable years, and respondent acknowledges that the IRS "missed" the 1984 through 1986 taxable years of other Kersting petitioners.

### 3.  The Thompsons' 1983 Kersting Deficiency and the Disappearing Statutory Notice

Concerning the year 1983, matters are substantially different.  Unlike 1982, the Thompsons' 1983 tax return did not slip through the cracks.  Instead, respondent's Fresno Service Center had prepared a statutory notice of deficiency dated March 17, 1987, disallowing Kersting deductions and asserting a deficiency of $980.  The statutory notice appears to have been issued; notations in respondent's administrative records indicate that respondent received an inquiry regarding that notice in May 1987.  Nonetheless, no petition on behalf of the Thompsons was filed in this Court regarding the deficiencies proposed for 1983.  Nor, moreover, did respondent assess or collect the deficiency determined in the statutory notice.  Instead, for reasons not explained, respondent's determination for 1983 was ignored, and the year was allowed to lapse.

Early in 1987, when the Thompson statutory notice of deficiency for 1983 was being prepared, McWade and DeCastro were actively involved in resolving the Thompsons' tax matters pursuant to their original settlement.  In March 1987, McWade provided a sweetener of the original settlement that slightly reduced the determined deficiencies for the years before the Court to bring the reduction up to 20.55 percent.  Additionally, during the prior December and January, he had helped process the Thompsons' interest payments for 1986.

If there were an explanation for the apparent abandonment of assessment and collection procedures well under way for the Thompsons' 1983 taxable year, we would expect respondent to be able to provide one, but he has not. Therefore, under the burden of proof approach we have adopted, we hold that the Thompsons' escape from a $980 deficiency for 1983 was part of the Thompson settlement, and that this amount should be included in the denominator for determining the percentage reduction in Kersting deficiencies to be afforded all affected taxpayers before the Court.[60]

### 4. The Thompsons' 1983-85 Bauspar Deductions

The Thompsons, like some other Kersting project participants, apparently deducted substantial amounts as home mortgage interest on their 1983-85 returns, on the basis of payments under the Bauspar program that may not have met the requirements for deductible home mortgage interest. While respondent concedes that the Thompsons probably derived a benefit from overstated Bauspar interest deductions for those years, the precise amount of that benefit is not readily ascertainable

---

[60]The last year for which the Thompsons claimed Kersting deductions was 1984. As discussed earlier, Revenue Agent Speers ultimately disallowed the Thompsons' Kersting deductions for that year ($7,740) in full, and the Thompsons paid the resulting deficiency of $1,830.

because the payees of claimed mortgage interest are not identified on the returns.

Although the Thompsons were audited by the IRS for each of the 1983-85 years, no deficiencies were ever determined against them with respect to the Bauspar program, even though, as respondent's counsel O'Neill reported: "There are some other docketed cases where we have disallowed mortgage interest." We believe that escaping Bauspar deficiencies was an implied term of the Thompson settlement; while Sims and McWade knew that the Thompsons had participated in the Bauspar program, the settlement that they engineered assured that no Bauspar deficiencies were determined, assessed, or collected from the Thompsons. Thus, in the absence of circumstances indicating that the Thompsons' escape from Bauspar-related deficiencies was not engineered by Sims or McWade, we conclude that Bauspar relief was part of the Thompson settlement.[61]

Because the amounts of the Thompsons' Bauspar deductions are incapable of determination with any precision, and because respondent disallowed Bauspar deductions only sporadically for a small number of taxpayers, we deal with this aspect of the Thompson settlement separately from our determination of the

---

[61]In so holding, we do not retract our conclusion in Dixon III that McWade and Sims lied in testifying that the final Thompson settlement had the purpose and effect of giving the Thompsons refunds by way of carrybacks of amounts they had lost by reason of their participation in Bauspar.

percentage reduction in Kersting deficiencies that will apply to all affected taxpayers.  See infra Part II.G.2.

### 5. The Thompsons' Deduction of Prepaid Interest on Their 1986 and 1987 Returns

#### 1986

The Thompsons paid $25,545 of deficiency interest on December 30, 1986.[62]  Because the Thompsons' adjusted gross income for 1986 was relatively low, they ultimately were able to use only $16,251 of deficiency interest as a deduction on their 1986 return.  Petitioners maintain that respondent should have disallowed that deduction in its entirety because the Thompsons did not pay the corresponding amount of the proposed deficiencies in 1986.

Petitioners' argument requires us to examine the state of the tax law as of December 30, 1986.  At that time, interest on Federal income tax deficiencies was treated as "personal interest", which was fully deductible by the taxpayer making the payment.  See Robinson v. Commissioner, 119 T.C. 44, 54 (2002).  During 1986, however, the Internal Revenue Code was amended, prospectively, to add a new section 163(h), which repealed the deduction for personal interest.  See TRA, Pub. L. 99-514, sec.

---

[62]Although the Thompsons purported to pay $59,545 of deficiency interest on that date (and reported that amount as deficiency interest expense on Schedule A, Itemized Deductions, of their 1986 return), the larger of the two checks issued for that purpose (in the amount of $34,000) was dishonored, and the Thompsons did not send a replacement check until February 1987.

511(b), 100 Stat. 2246.  Under the provision, 1986 was the last taxable year in which taxpayers could deduct 100 percent of such personal interest.  TRA sec. 511(e), 100 Stat. 2246.  For the next year, 1987, only 65 percent of personal interest was deductible, and the deduction for personal interest was phased out entirely by the end of 1989.  Sec. 163(h)(6).

In a news release issued October 23, 1986, the IRS advised: "Since under the Tax Reform Act of 1986 interest on most tax deficiencies of individual taxpayers will not be fully deductible after 1986, taxpayers may wish to pay actual or contested deficiencies now to obtain the full interest deduction on 1986 tax returns."  The news release accordingly included, as an attachment, Announcement 86-108 (Ann. 86-108), 1986-45 I.R.B. 20, which provided guidance to taxpayers wishing to obtain the full deductibility of deficiency interest in 1986.

Under paragraph 4, "General Considerations", Ann. 86-108 states:  "In general, a taxpayer may not pay interest on a contested deficiency without simultaneously paying, or agreeing to pay, the underlying tax deficiency with respect to which the interest is being paid."  The "Detailed Instructions" of Ann. 86-108 describe two situations that arguably apply here.  Respondent argues that the Thompsons' situation was governed by section C.1.b. ("Taxpayers Desiring to Settle Their Tax Court Cases"). Under this provision a taxpayer whose case is pending before this

Court and who "wishes to settle the case on some other basis than a full concession" is directed to contact respondent's attorney or Appeals officer to whom the case is assigned.  Then, "If a settlement is agreed to, the attorney or Appeals Officer will prepare the appropriate decision document."  Id.

In this case, when they prepaid their interest, the Thompsons (through DeCastro) had actually reached a settlement of their liabilities for 1979-1981 with McWade.  McWade prepared the appropriate decision documents, and he and DeCastro both signed those documents, which reflected the settlement and contained an express waiver of the restrictions against assessment and collection of the liabilities.  Accordingly, as of December 31, 1986, the Thompsons had agreed to pay approximately 80 percent of the deficiencies originally determined against them, and their attorney had, in fact, executed decision documents to that effect.  Under section C.1.b of Ann. 86-108, the Thompsons' agreement appears to have qualified their payment of deficiency interest for full deductibility.

Petitioners argue that another provision of Ann. 86-108 applies.  Section C.1.c. addresses "Taxpayers Desiring to Make a Payment in 1986, While Continuing to Contest the Asserted Deficiency in Tax Court".  That provision directs that, in order to obtain an interest deduction for payment made in 1986 while continuing to litigate before the Tax Court, the taxpayer must

simultaneously pay the amount of the contested tax deficiency to which the interest being paid is attributable. Petitioners note that the agreement between DeCastro and McWade permitted the Thompsons to receive the better of their settlement agreement or the result of the Tax Court proceedings. Accordingly, petitioners argue, the Thompsons were, in effect, continuing to contest the determined deficiencies in this Court within the scope of Ann. 86-108, sec. C.1.c. Petitioners therefore maintain that because the Thompsons prepaid only the interest and none of the contested tax deficiencies, the Thompsons were not entitled, under Ann. 86-108 section C.1.c., to deduct the interest.

In Perkins v. Commissioner, 92 T.C. 749 (1989), a reviewed opinion with no dissents, this Court held that a payment designated as accrued interest made after a notice of deficiency has been issued is deductible in the year paid, even though the underlying tax has not been paid. See also Preble v. Commissioner, T.C. Memo. 1989-208. We based our holding on two provisions of the Internal Revenue Code: Section 163(a), which permits a deduction of interest without requiring that the underlying obligation be paid, and section 461(f), which permits a deduction of interest in the year in which it is paid, even though the taxpayer's liability for the underlying debt is contested. We concluded that the revenue procedure upon which section C.1.c. of Ann. 86-108 is based had imposed "an

unwarranted restriction" by requiring payment of the obligation.
Perkins v. Commissioner, supra at 760.

Petitioners argue that we rejected respondent's restrictions
on the deductibility of interest on contested deficiencies well
after the Thompsons had deducted such interest. At that time,
they argue, section C.1.c. of Ann. 86-108 operated to deny the
claimed deduction. Petitioners' argument, in sum, is that
respondent should have disallowed the Thompsons' 1986 interest
deduction under an incorrect legal theory. Petitioners
essentially ask that we include in the denominator of the
settlement fraction a tax benefit to which the Thompsons were
already entitled under a correct application of the law. We
decline to do so, regardless of whether McWade played any part in
respondent's allowance of the deduction.

### 1987

The Thompsons reported deficiency interest expense of
$42,945 on Schedule A of their 1987 return and deducted 65
percent of that amount ($27,914). See supra note 14. The
claimed deduction appears to derive from Poltash's misguided
attempt to carry over the unused portion of the $59,545 of
deficiency interest expense reported on Schedule A of the
Thompsons' 1986 return. See supra note 15. Such a deduction was
improper; the Internal Revenue Code did not and does not permit

the carryover of an individual cash-basis taxpayer's unused personal interest deduction from one year to the next.

The Thompsons did, however, make a valid payment of interest early in 1987, when they issued a valid check for $34,340 to replace the dishonored check they had mailed the previous year (the extra $340 was a bad check charge). As cash-basis taxpayers, and under the law applicable for 1987, they would have been permitted to deduct 65 percent of that amount, or $22,100, as personal interest. This valid deduction would have been $5,814 less than the $27,914 actually claimed and used as an interest deduction on their 1987 return. If the $5,814 excess amount deducted were added back to their taxable income for 1987, the Thompsons' tax liability would have been increased by $1,624.

Accordingly, we conclude that for their taxable year 1987 the Thompsons received a modest tax benefit during the time McWade and DeCastro were colluding to reduce the Thompsons' tax liabilities. There is no evidence that McWade directly intervened to cause this excess deduction, but there is evidence that he took an active role in seeing that the prepaid interest was posted in time to permit full deduction in 1986. We conclude that the excess deduction of personal interest in 1987 is improper and not one that would have been extended to other affected taxpayers. Thus, while it is unclear that McWade undertook any action to secure the improper deduction, it is also

unclear that he did not, and he had the access and ability to do so.  In accordance with the burden of proof we have imposed upon respondent, and in the absence of circumstances showing that the Thompsons' excess interest deduction for 1987 was not engineered with the collusion of respondent's counsel, we find that this benefit was part of the Thompson settlement.  We shall add the $1,624 tax benefit to the denominator of the fraction that will determine the percentage reduction in Kersting deficiencies to be afforded all affected taxpayers.

6.   The Thompsons' Attorney's Fee
     Deduction for 1993

On their 1993 tax return, the Thompsons deducted the additional $51,000 of legal fees paid in that year to DeCastro. Petitioners maintain that the deduction of legal fees paid to DeCastro was improper, and that the amounts so deducted should be included in the Thompson settlement.  We disagree.

Section 212(3) allows the deduction of legal fees paid or incurred "in connection with the determination, collection, or refund of any tax."  Regulations further provide that "expenses paid or incurred by a taxpayer for tax counsel or expenses paid or incurred in connection with the preparation of his tax returns or in connection with any proceedings involved in determining the extent of tax liability or in contesting his tax liability are deductible."  Sec. 1.212-1(l), Income Tax Regs.

DeCastro obviously represented the Thompsons in "proceedings involved in determining the extent of tax liability or in contesting * * * tax liability."  The Thompsons hired him to resolve their tax problems.  He did so, not only by negotiating the settlements with McWade but also by appearing on behalf of the Thompsons at the trial of the test cases in 1989. Additionally, after respondent had discovered and disclosed the misconduct of respondent's counsel, DeCastro successfully enforced the terms of the new settlement, over respondent's objections, in the Tax Court.  The Thompsons' payments to DeCastro clearly satisfy the definition of deductible legal fees.

Petitioners complain that, in view of DeCastro's fraudulent deal with McWade, DeCastro's legal fees fail to meet the statutory requirement that they be "ordinary and necessary" expenses of the Thompsons.  Petitioners' complaint ignores the Supreme Court's holding in Commissioner v. Tellier, 383 U.S. 687 (1966), that legal fees otherwise qualifying as ordinary and necessary expenses are deductible without regard to public policy objections.  Although DeCastro appears to have participated in the fraud on the court, his fees remain deductible for tax purposes; the basic proposition is that "the federal income tax is a tax on net income, not a sanction against wrongdoing."  Id. at 691.  Moreover, "With respect to deductions, the basic rule, with only a few limited and well-defined exceptions, is the

same."[63]  Id.  We conclude that the Thompsons' payments of
DeCastro's legal fees generated allowable deductions that were
not a part of the improper tax benefits provided by the Thompson
settlement.

    7.    The Thompsons' Failure To Report
          Tax Benefit Income for 1993

    While we agree with respondent that the Thompsons were
entitled to deduct the attorney's fees paid to DeCastro in 1993,
we agree with petitioners that the Thompsons' 1993 return is
incorrect in a different respect:  it does not reflect the
Thompsons' realization of income under the tax benefit rule.
Recall that the Thompsons deducted $44,165 of deficiency interest
expense for 1986-1987 ($16,251 for 1986 and $27,914 for 1987) as
a result of their interest prepayments for the deficiency years
1979-1981.  This Court's order and decision of August 26, 1992,
which held respondent to the terms of the Thompson settlement,
resulted in the Thompsons' ultimately paying only $27,506 in
interest for those years.

    This situation should have resulted in application of the
tax benefit rule.  The tax benefit rule is a judicially created
principle that serves to remedy certain disparities inherent in
the use of an annual accounting system for the reporting of

---

[63]The statutory exceptions, none of which applies here, are
contained in sec. 162(c), (f), and (g).  See sec. 1.212-1(p),
Income Tax Regs.

Federal income taxes.  Hillsboro Natl. Bank v. Commissioner, 460
U.S. 370, 377 (1983).  The tax benefit rule rectifies the
inequity that results when a deduction is taken during one
taxable year and later events show that the deduction would not
have been allowable if all relevant facts had been known at the
time of the deduction.  Id. at 383-384.  In operation, the tax
benefit rule requires the taxpayer to recognize the amount so
deducted as income in the year of the later, inconsistent event.
The amount the taxpayer must include in income, however, is
limited to the amount of the deduction that provided a tax
benefit for the prior year.  E.g., Rojas v. Commissioner, 90 T.C.
1090, 1097 (1988), affd. 901 F.2d 810 (9th Cir. 1990).  In the
case at hand, the excess of the $44,165 deducted over the $27,506
actually paid as interest is $16,659.  The inconsistent event
occurred in January 1993, when respondent assessed only $27,506
of interest with respect to the Thompsons' 1980 and 1981 tax
years on the basis of the decisions entered by the Tax Court in
August 1992.  Respondent in effect refunded the excess $16,659 to
the Thompsons by applying it as a credit toward their $15,000
deficiencies for each of 1980 and 1981.  The Thompsons thus had a
"tax benefit" of $16,659 in 1993 that they failed to report on
their return for that year.

Although the Thompsons' failure to include income under the
tax benefit rule was erroneous, it did not result from the

intervention of respondent's attorneys. To the contrary, by the time the Thompsons filed their 1993 income tax return, many attorneys in respondent's Office of Chief Counsel, at the local, regional, and national levels, were seeking to control the damage caused by McWade's preferential treatment of the Thompsons for the years 1979-1981. The misconduct was also before the Court of Appeals in the DuFresne appeal. McWade had retired from the IRS, and Sims had been disciplined by respondent's Regional Counsel. Responsibility for the Kersting project cases had been transferred to Dombrowski and O'Neill. The sources of the misconduct in the handling of the Thompsons' tax matters had been effectively removed.

Dombrowski, who was assigned McWade's duties with respect to the test cases, did not engage in or perpetuate any misconduct. He instead found himself faced with DeCastro's apparently valid request for a refund of interest accruing on the payments the Thompsons had paid for their 1979-1981 taxable years. Dombrowski approved that refund only after obtaining the approval of his superior in the Regional Office and only after having some of respondent's experienced employees doublecheck his figures.

During his testimony, Dombrowski did not recall whether he had told DeCastro about the income tax ramifications of the refund under the tax benefit rule, but it was not his duty to do so. Dombrowski's approval of a refund of interest and

deficiencies was a result of his assignment to take over McWade's duties for the Thompsons' taxable years 1979-1981 that were before the Court and that had been affected by the misconduct of McWade and Sims.  There is no basis for finding that Dombrowski had an affirmative obligation to demand, or intervene in, any audit of the Thompsons' 1993 return as subsequently filed in 1994.  To the contrary, any errors of omission or commission in failing to report the Thompsons' tax benefit income were the responsibility of Poltash, their tax accountant, and DeCastro, their tax attorney.  We therefore conclude that respondent's failure to ensure that the Thompsons reported tax benefit income on their 1993 return (and respondent's subsequent failure to adjust the return accordingly) was not part of the Thompson settlement.

8.    Payment of Witness Fees to Mr. Thompson

Petitioners urge that the Thompson settlement includes respondent's payment of witness fees and mileage to Mr. Thompson, who testified in January 1989 at the trial before Judge Goffe in response to a subpoena issued by respondent.  We have noted that respondent subpoenaed all the test case petitioners and also paid Mr. Cravens's witness fees.  We have also noted that there is no record evidence regarding any requests for reimbursement of

witness fees on behalf of any other test case petitioner.[64]  Such requests would have been required in order to obtain reimbursement, inasmuch as Rule 148(b) in effect provides that the Commissioner, unlike a private party, is not required to tender fees and mileage in order to issue a valid subpoena.

On the basis of this record, we do not believe respondent's payment of Thompson's witness fees and expenses was a benefit that was unavailable to the other petitioners who testified at the trial of the test cases.  Accordingly, we conclude that such payment was not part of the Thompson settlement.  Having so concluded, there is no need to reach petitioners' argument that the payment of Thompson's fees was a benefit that should be given effect by subtracting it from the numerator of the settlement fraction rather than adding it to the denominator.

9.    Release of Lien on the Thompsons'
      Property and Other Intangible Benefits

On February 8, 1982, respondent had filed a notice of Federal tax lien for the unpaid balance due of $23,385.78 for the Thompsons' taxable year 1978, which did not involve the

---

[64]Rule 148(a) states:  "Any witness summoned to a hearing or trial, or whose deposition is taken, shall receive the same fees and mileage as witnesses in the United States District Courts." Rule 148(b) refers to sec. 7457(b)(1), which provides in turn: "In the case of witnesses for the Secretary, such payments [of fees, mileage and expenses] shall be made by the Secretary out of any moneys appropriated for the collection of internal revenue taxes".

disallowance of any Kersting deductions. As detailed in
respondent's records, the Thompsons made a number of payments on
the liability, which was finally satisfied in September 1987.
Under section 6325(a)(1), the IRS was required to issue a
certificate of release of lien within 30 days (in this case, by
October 7, 1987). This was not done in a timely fashion. The
lien was released, however, following a meeting between DeCastro
and McWade in Hawaii late in 1988 at the time of Kersting's
deposition. Again, although this relief may have been brought
about by McWade's efforts, it was not a tax advantage that would
not have been available to other similarly situated taxpayers.
The Thompsons were entitled to have the lien released by
operation of section 6325(a). We believe that an inquiry by any
other taxpayer's representative would have produced the same
relief. We conclude that the release of the lien was not a part
of the Thompson settlement.

Petitioners argue that the Thompsons received other
"intangible benefits", including not only "assistance with
getting the tax lien released from their house", but also "use of
the test-case trial as a platform for defending against Henry
Kersting, and avoiding the collection, litigation, disillusion
and anxiety that have been experienced by the other taxpayers."
They concede that, in terms of imposing sanctions, "it does not
seem possible to confer those benefits on other taxpayers." They

urge, however, that such benefits be deemed "ballast" in weighing the sanctions to be imposed.

We believe that, in responding as we have to the mandates of the Court of Appeals, we have accounted for the problems faced by the other affected taxpayers. We are painfully aware, as the Court of Appeals for the Ninth Circuit has observed, that "Enormous amounts of time and judicial resources have been wasted" and further that the "taxpayers should not be forced to endure another trial". Dixon v. Commissioner, 316 F.3d at 1047. We further recognize the urgent need to "equitably resolve this situation" to the best of our abilities. Id. Despite our rejection of any notion of "ballast" as an impermissible invitation to fix damages against respondent, we are confident that our implementation of the mandates, in conjunction with respondent's concession cutting short the accrual of interest on deficiencies, see infra Part III, will provide substantial relief to all affected taxpayers.

F.   The Percentage Reduction Summarized

To summarize our holdings above, we shall direct that the Kersting-related deficiencies[65] for each of the affected taxpayers are to be reduced by a factor of 63.37 percent; that is, affected taxpayers will have to pay 36.63 percent of the

---

[65]We do not include in that term deficiencies relating to Bauspar.  See infra Part II.G.2.

amounts of tax they would have had to pay.  We have calculated the reduction percentage as follows:

The numerator is $30,000, representing the total deficiencies paid by the Thompsons for the taxable years before the Court, that is, their taxable years 1979-1981.

The denominator is initially $79,294, representing the total deficiencies that respondent asserted against the Thompsons for their 1979-1981 taxable years.  To this sum we add $980, representing the deficiency the Thompsons escaped paying for the year 1983 by virtue of respondent's unexplained failure to follow up on the statutory notice of deficiency for that year.  We also add $1,624 to the denominator, which represents the Thompsons' tax savings attributable to respondent's allowance of a 1987 personal interest deduction that was overstated by $5,814 ($27,914 - $22,100).  The total denominator is thus $81,898.

$$\$30,000/\$81,898 = 36.63\%$$

G.    Additional Relief

1.    Elimination of Non-Kersting Additions

Although the parties' stipulation of settled issues can be read as limiting penalty relief to Kersting-related additions, see supra Part II.B., respondent does not dispute that implementation of the Court of Appeals' mandates includes the elimination of all penalties and additions, including non-Kersting-related items such as late filing additions.  We agree

and so hold.  It seems especially incongruous to impose an addition for a few months' delay in filing a return at this time, when 25 years have passed since that delay occurred.  All affected taxpayers are to be relieved of all penalties and additions to tax that were determined in their statutory notices of deficiency, not just Kersting-related items such as negligence additions.

2.   Allowance of Bauspar Deductions

We concluded earlier that Bauspar relief was part of the Thompson settlement.  See supra Part II.E.4.  Moreover, respondent's analysis of the Bauspar program indicates that at least some of the alleged mortgage payments made to Bauspar by its borrowers would qualify for mortgage interest deductions; as respondent's counsel Henry O'Neill (O'Neill) observed:  "real dollars are involved".  Accordingly, we shall direct that any disallowed deductions relating to Bauspar are to be treated as valid deductions with respect to those taxpayers who may have claimed them.  That's the way Bauspar played out for the Thompsons, and so should it be for the other taxpayers before the Court against whom Bauspar-related deficiencies have been determined.

3.   Elimination of Non-Kersting Deficiencies

Respondent indicates that perhaps 100 of the affected taxpayers have non-Kersting-related items in the deficiencies

determined against them.  We see no reason to treat those non-Kersting deficiencies differently from non-Kersting additions. As with those additions, the resolution of non-Kersting issues has been delayed much too long.  Rule 142(a), as in effect during the years at issue, would impose upon those petitioners the burden of proving those deficiencies to be erroneous.  We think it would be inherently unfair to impose upon them the risks that memories have faded and records have been lost or destroyed during the long delay in resolution of the Kersting issues, a delay primarily caused by the misconduct of respondent's attorneys.  Moreover, we suspect that the non-Kersting issues are relatively minor when compared to the Kersting-related deductions that are at issue in all these cases.  We therefore direct that all non-Kersting-related deficiencies determined in the notices of deficiency for all affected taxpayers with taxable years still before this Court be eliminated.

### 4.   Attorney's Fees

We further recall that respondent made the somewhat empty concession that the other affected Kersting petitioners should be reimbursed for any attorney's fees they incurred during the trial of the test cases before Judge Goffe.  The concession is illusory because, as respondent acknowledges, such fees were incurred and paid by Kersting himself, not by the affected petitioners.

Respondent's facile concession gives us occasion to observe that the Court will address the matter of attorney's fees for petitioners' prosecution of these cases on appeal, as well as petitioners' attorney's fees for the conduct of the postmandate evidentiary hearing, in separate opinions and orders.

III. Interest on Deficiencies and Overpayments

Respondent has conceded that the accrual of interest on taxpayer deficiencies ultimately determined by this Court should be tolled as of June 1992, in accordance with the then Chief Counsel's public announcement on January 21, 2003. Petitioners, however, maintain that the accrual of interest on any deficiencies that remain after application of the Thompson settlement should be halted as of December 31, 1986--the date by which, petitioners maintain, the fraudulent McWade-DeCastro agreement was first entered into.

The protracted nature of these proceedings has exaggerated the impact of interest upon amounts that are owed by (or owed to) the affected taxpayers. Informed by this realization, at a status conference held in these cases on August 19, 2003, the Court asked respondent to compare the fiscal consequences of characterizing the Thompson settlement as (i) a 20-percent reduction in the deficiencies determined by respondent, (ii) a 62-percent reduction, or (iii) an 80-percent reduction, with

interest accruals terminated as of (a) June 1, 1992, and (b) December 31, 1986.[66]

Respondent produced figures that would approximate the overall fiscal consequences in the scenarios described above. Respondent further calculated that, if interest on the aggregate deficiencies were allowed to accrue unabated, it would amount to almost 6 times the amount of the deficiencies:

| | |
|---|---|
| Deficiencies | $ 27,442,000 |
| Interest through 12/31/05 | 155,078,215 |
| Total | 182,520,215 |

Respondent calculates that, in the case of a hypothetical petitioner who owes $10,000 as a result of Kersting deductions claimed for the taxable year 1980, the accrued interest payable at the end of calendar year 2005 would have been $86,336,02.

For taxpayers who prepaid the deficiencies determined against them, the results would be similarly substantial, but in their favor. For example, we have considered the effect of a 62-percent reduction in deficiencies on a hypothetical petitioner who had prepaid a deficiency for 1980 of $10,000. Our

---

[66]On Sept. 17, 2003, Sticht, counsel for some of the nontest case petitioners, filed a motion to strike respondent's interest estimates. The Court held that motion in abeyance, without examining the estimates, until Nov. 16, 2004, when it entered an order denying Sticht's motion. We are aware of no authority indicating that the Court may not be aware of the financial consequences of the sanction it is being asked to order at the conclusion of the case before it. In the final analysis, however, in determining the sanctions to be imposed under the mandates, the Court has not been influenced by respondent's projections.

calculations indicate that, in addition to a $6,200 refund of tax, respondent would owe that taxpayer $59,728 of interest as of the close of calendar year 2005.

It is basic that accrued interest will vary depending upon the amount owed, the time the amount has been owing, and the rates at which the interest accrues. The parties differ not only over the amount owed, that is, the amount of the deficiencies, but also the time the deficiencies should be deemed to have been outstanding (there does appear to be a consensus, with which the Court agrees, that the applicable rates of interest are those prescribed pursuant to section 6621 and set forth most recently in Rev. Rul. 2005-62, 2005-38 I.R.B. 557, which adopts the tables provided in Rev Proc. 95-17, 1995-1 C.B. 556).

Inasmuch as this Court is a court of limited jurisdiction, we may exercise jurisdiction only to the extent expressly authorized by statute. Sec. 7442; Judge v. Commissioner, 88 T.C. 1175, 1180-1181 (1987); Naftel v. Commissioner, 85 T.C. 527, 529 (1985). While this Court has jurisdiction to determine deficiencies in tax pursuant to section 6214, it is well settled that such jurisdiction generally does not extend to statutory interest imposed under section 6601. See Bax v. Commissioner, 13 F.3d 54, 56-57 (2d Cir. 1993); Pen Coal Corp. v. Commissioner, 107 T.C. 249, 255 (1996); LTV Corp. v. Commissioner, 64 T.C. 589, 597 (1975); see also Betz v. Commissioner, 90 T.C. 816, 823

(1988); <u>Asciutto v. Commissioner</u>, T.C. Memo. 1992-564, affd. 26 F.3d 108 (9th Cir. 1994).  Section 6601(e)(1) expressly provides that interest prescribed by section 6601 is treated as tax "except [for purposes of] subchapter B of chapter 63, relating to deficiency procedures".  Because this exception excludes interest from the definition of "tax" for purposes of section 6211(a) (defining the term "deficiency"), it follows that such interest is not treated as part of the underlying deficiency.  See <u>White v. Commissioner</u>, 95 T.C. 209, 213 (1990).

In contrast, as we recognized in <u>Lincir v. Commissioner</u>, 115 T.C. 293, 298 (2000), affd. 32 Fed. Appx. 278 (9th Cir. 2002), section 6601(e) does not curtail our jurisdiction over interest on overpayments of taxes.  Instead, the Court does have jurisdiction to redetermine statutory interest where a taxpayer has properly invoked the Court's overpayment jurisdiction pursuant to section 6512.  The cases before the Court, however, involve both interest owed by petitioners on deficiencies, over which we arguably lack jurisdiction, and interest owed by respondent on overpayments, over which we clearly have jurisdiction.

This possible divergence in our jurisdictional authority has the potential, at least, for interfering with our execution of the mandates of the Court of Appeals, which, we believe, require

relief not only to taxpayers to whom respondent owes interest, but also to taxpayers who owe interest to respondent.[67]

We are given further pause by the holding of the Supreme Court in Commissioner v. McCoy, 484 U.S. 3 (1987).  In McCoy, the Court of Appeals for the Sixth Circuit issued an unpublished order following its affirmance--809 F.3d 333 (6th Cir. 1987), affg. T.C. Memo. 1985-509--of the Tax Court's denial of special use estate tax valuation.  In its order, the Court of Appeals had granted the taxpayer's request for relief from interest and penalties, which "now exceed the assessed tax" and ordered the Tax Court to forgive the interest and penalties "in order to achieve a fair and just result."  Id. at 5-6.  In a per curiam opinion, Justice Marshall dissenting, the Supreme Court held that the Court of Appeals had exceeded its jurisdiction in ordering the Tax Court to forgive interest on the determined deficiency in estate tax and to forgive the statutorily imposed late payment penalty.  In so doing, the Supreme Court observed:

[67]The Court is concerned about the parties' stipulation filed on June 22, 2005, wherein they apparently seek to remove from this Court's consideration the issue of whether any remittance by an affected taxpayer is an (interest bearing) advance payment or a (non-interest bearing) cash bond.  This Court is not bound by such stipulation.  We believe the mandates of the Court of Appeals require that interest be paid to all affected taxpayers who made remittances with respect to Kersting deficiencies, as was the case with the Thompsons.  Inasmuch as we have jurisdiction over interest on overpayments, we shall direct respondent to compute and pay such interest to all affected taxpayers who made remittances with respect to the deficiencies that had been determined against them.

> Plainly, the court of appeals lacks jurisdiction to decide an issue that was not the subject of the Tax Court proceeding or to grant relief that is beyond the powers of the Tax Court itself. [Id. at 6.]

We conclude our discussion of McCoy by noting, as does respondent, that the Supreme Court, in overruling the forgiveness of a generally applicable statutory interest accrual on deficiencies under section 6601 by the Court of Appeals for the Sixth Circuit, had no occasion to address a court's inherent authority to impose sanctions in a case of Government misconduct.

Moreover, in Estate of Branson v. Commissioner, 264 F.3d 904 (9th Cir. 2001), the Court of Appeals for the Ninth Circuit adopted an expansive view of the Tax Court's equitable or inherent powers. The court stated:

> "the Tax Court exercises its judicial power in much the same way as the federal district courts exercise theirs." Freytag v. Commissioner of Internal Revenue, 501 U.S. 868, 891, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). This includes the authority to apply the full range of equitable principles generally granted to courts that possess judicial powers. "Even if the Tax Court does not have far-reaching general equitable powers, it can apply equitable principles and exercise equitable powers within its own jurisdictional competence." Estate of Ashman v. Commissioner of Internal Revenue, 231 F.3d 541, 545 (9th Cir. 2000); See also Kelley [v. Commissioner], 45 F.3d [348] at 352 [(9th Cir. 1995)] (Tax Court has equitable power to reform agreements between taxpayer and IRS); Buchine v. Commissioner of Internal Revenue Service, 20 F.3d 173, 178 (5th Cir. 1994) (holding that the Tax Court had the authority to apply the "equitable principle of reformation to a case over which it had jurisdiction"). [Id. at 908-909.]

It would appear that, in issuing its opinion and mandates in Dixon V, the Court of Appeals for the Ninth Circuit, consistent with its opinion in Commissioner v. Branson, supra, adopted the view that the Tax Court had and has equitable power to resolve the situation then before it, and now before us.

More to the point, we regard respondent's concession not to collect interest on deficiencies that would otherwise accrue beyond June 1992 as an appropriately targeted response to the consequences of his former attorneys' fraud on the court, which caused substantial delay in the resolution of the Kersting project cases.[68]  We have respondent's assurance that he will give effect to the concession; we are satisfied he will do so. Moreover, in accepting and endorsing respondent's concession, we need not and do not reach petitioners' argument that the Tax Court has the power and obligation to abate or cancel interest on deficiencies as of an earlier date.[69]

---

[68]On May 14, 1992, test case petitioners Dixon, DuFresne, Young, and Hongsermeier had already appealed their test cases, before the misconduct of respondent's attorneys was discovered and disclosed.  It is reasonable to assume that the conduct of their appeals would have caused a delay of at least 1 or 2 years before the Kersting project test cases would have been finally decided, even if there had been no such misconduct.  In these circumstances, we would not be inclined, even if our power to do so were clear, to cancel or abate interest as of an earlier date than respondent has conceded.

[69]In any event, we reject petitioners' citation and discussion of United States v. Verdugo-Urquidez, 856 F.2d 1214, 1231 (9th Cir. 1988) (Wallace, J., dissenting), revd. 494 U.S.

(continued...)

In the unlikely event respondent fails to give effect to the concession (or if there is a dispute about how the concession is to be applied), there will be time enough to consider whether and how to address the matter in a collection action or other appropriate proceeding.

To give effect to the foregoing,

Decisions will be entered under Rule 155.

---

[69](...continued) 259 (1990) and Riggs v. Palmer, 22 N.E. 188, 190 (N.Y. App. Ct. App. 1889), as authorizing (or even suggesting) the proposition that accrual of interest on Kersting-related deficiencies as they have been reduced by our application of the mandates should cease as of Dec. 31, 1986, the date petitioners argue the fraud commenced.

Petitioners also argue that interest should not continue to accrue beyond Dec. 31, 1986, because the result of the final settlement arrived at in 1989 was to convert the interest payments made by the Thompsons as of Dec. 31, 1986, into payments of tax that satisfied their agreed tax liabilities and stopped any further accrual of interest against them. It suffices to point out that the Thompsons made the necessary payments around the end of 1986. Those petitioners who remain in a deficiency/ underpayment posture under the mandates made no such payments, and interest on their reduced deficiencies therefore continued to accrue until the effective date of respondent's concession.